Howry, Judge,
delivered the opinion of the court:
Under the jurisdictional act set forth in the margin,[1] Whit-mire, as trustee, filed his original petition in this case on the 26th day of September, 1891, in which he alleges that under the terms of the treaty of July 19, 1866, the freedmen and free colored persons of the Cherokee Nation are and have been entitled to participate in the common property of said nation as if they were Cherokees by blood, and that certain sums of money have been or are in the Treasury of the United States or the Cherokee Nation, and have been or ate about to be paid to members of the Cherokee Nation, per capita, to the exclusion of said freedmen and free colored persons, and prays that said freedmen and free colored persons may be found and decreed to be seized of and to have and enjoy proportionate rights, interests, titles, and shares in all the said common property of said nation as if they were Cherokees by blood, and that they may have judgment for their proportionate interest in such sums as have been or *233 may be about to be paid to the members of the Cherokee Nationj per capita.
On the 3d day of May, 1893, he filed his amended petition • alleging that by act approved March 4, 1893, 2T Stat. L., 640, the United States had bought from the Cherokee Nation that portion of its territory known as the “ Cherokee Outlet,” paying therefor the sum of $8,595,736, and praying for judgment securing to the said freedmen and free colored persons full participation in this fund also.
On the 8th day of May, 1895, this court passed a decree declaring that the freedmen who had been liberated by voluntary act of their former owners, or by law, and all free colored persons who resided in the Cherokee country at the commencement of the rebellion and who were residents therein at the date of said treaty, or who had returned thereto within six months of said last-mentioned date, and their descendants, were admitted into and became a part of the Cherokee Nation and entitled to equal rights and immunities and to participate in the Cherokee national funds and common property in the same manner and to the same extent as Cherokee citizens of Cherokee blood; and that, in the distribution of the proceeds and avails of the public domain or common property of the nation among the citizens thereof by distribution per capita at any time hereafter, the defendant, the Cherokee Nation, and the defendant, the United States, as trustee of the Cherokee Nation, be enjoined and prohibited from making any discrimination between the Cherokee citizens of Cherokee blood or parentage and Cherokee citizens who are or were freedmen who had been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the Cherokee country at the commencement of the rebellion, and were residents therein at the date of said treaty, or who returned thereto within six months thereafter, and their descendants, to the prejudice of the latter.
And it further appearing to the court that an enumeration of the aforesaid freedmen, free colored persons, and their descendants was made and approved under and by virtue of an act of Congress by the Secretary of the Interior *234 of the United States, and that said census of the aforesaid freedmen and free colored persons and their descendants was known as the “Wallace roll,” and that said Wallace roll contained the number of said persons as were in existence on the 4th of March, 1883, and that the number of said persons shown therebj^ was 3,524; and that the defendant, the Cherokee Nation, did not participate in the preparation of said Wallace roll, but that ample opportunity was afforded it to do so; and that its refusal to do so is as effective as if it had actually taken part in the preparation of said Wallace roll, and it is concluded thereby. It was therefore adjudged and decreed that said Wallace roll, showing 3,524 of such persons, be approved by this court and taken by it as furnishing the true number of the freedmen, to wit, 3,524, as being the number of freedmen to be entitled, together with the other citizens of the Cherokee Nation, to be taken as a basis in estimating the amount of money to be decreed to be paid plaintiffs in this action.
Thereupon both the claimant and the defendant prayed an appeal to the Supreme Court. While these applications were pending they agreed between themselves upon a decree, and filed in this court a stipulation to mutually withdraw their applications for appeal upon the entry of their said decree.
This action was approved by this court, and on the 3d day •of February, 1896, this court entered said decree nunc fro tunc as of May 8,1895.
In this latter decree it was provided that the complainants in this suit and those whom they represent, being the freedmen and free colored persons aforesaid and their descendants living and in being on the 3d day of May, 1894, are entitled to participate hereafter in the common property of the Cherokee Nation in the same manner and to the same extent as Cherokee citizens of Cherokee blood or parentage may be entitled, and that in the distribution of the proceeds and avails of the public domain or common property of the nation among the citizens thereof by distribution per capita at any time hereafter, the defendant, the Cherokee Nation, and the defendant, the United States, as trustee of the Cherokee Nation, be enjoined and prohibited from making any dis *235 crimination between the Cherokee citizens of Cherokee blood or parentage and Cherokee citizens who are or were freedmen who had been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the Cherokee country at the commencement of the rebellion, and were residents therein at the date of said treaty, or who returned thereto within six months thereafter, and their descendants, to the prejudice of the latter; it being understood that the freedmen and their descendants and free colored persons above referred to shall include only such persons of said class as have not forfeited or abjured their citizenship of said Cherokee Nation at the date of entering of this decree.
And the Secretary of the Interior was authorized to appoint three commissioners, one on the nomination of the complainant and one on the nomination of the defendant, the Cherokee Nation, but both nominations to be approved by him, to proceed to the Cherokee country and hear the testimony both for and against the identity of all freedmen, free colored persons and their descendants, claiming to be entitled to share in the distribution of $903,365, that may be offered by the respective parties to this suit; and that each of said parties shall be entitled to be represented before said commissioners, either at the taking of testimony in the Cherokee country or elsewhere; and that the said commissioners in ascertaining the identity of the freedmen entitled to share under this decree shall accept what is known as the authenticated Cherokee roll, the same now being on file in the office of the Secretary of the Interior, having been furnished to him and purporting to have been taken by the Cherokee Nation in 1880 for the purpose of showing the number of freedmen then entitled to citizenship in the said nation under the terms of the treaty between the United States and the Cherokee Nation hereinbefore referred to, and their descendants; and the said commissioners shall ascertain who of said persons named on said roll were alive and what descendants of said persons were alive on May 3,1894, and no evidence shall be accepted by said commission tending to disprove the citizenship of any of the persons whose names appear upon said roll.
*236 On the 18th day of February, 1890, and in response to questions propounded by the Commissioner of Indian Affairs, this court decided that the clause in Article IX of the treaty with the Cherokee Nation, July 19, 1866, in these words, “And are now residents therein, or who may return within six months, and their descendants,” were intended for the protection of the Cherokee Nation as a limitation upon the number of persons who might avail themselves of the provisions of the treaty, and consequently that they referred to both the freedmen and the free colored persons previously named in the article; that is to say, freedmen and the descendants of freedmen who did not return within six months are excluded from the benefits of the treaty and of the decree, and that this period of six months extends from the date of the promulgation of the treaty, August 11, 1866, and consequently did not expire until February 11, 1867.
On April 14,1896, the claimant filed a motion in this court reciting that in many instances the former slaves of the Cherokee Nation during the Eebellion were taken from that country by their owners, the Cherokees, to the far Southern States, and in some instances to old Mexico. That at the conclusion of the war some of these slaves who had enlisted in the Union Army were disbanded at various points of the Union far away from the Cherokee country. That both of these classes, of freedmen were left at these various points penniless and ignorant, but with no intention of abandoning their residence in the Cherokee country; that as soon as possible they returned to the Cherokee country, but some of them not within the six months’ limitation specified in the treaty; that these people have resided there continuously since and been as good citizens as that country has. And asking that these people be included in the said roll' directed to be made under, the decree of this court. This motion was overruled on the 15th day of April, 1896.
On the 20th day of February, 1896, the Secretary of the Interior appointed commissioners to make a roll of the freedmen and free colored persons of the Cherokee Nation. These commissioners went to the Cherokee Nation and made up a roll of the individual freedmen and free colored persons of *237 the said nation living and in being on the 3d day of May,' 1894, who were entitled under the terms of the decree to citizenship in the nation and to share in the distribution in its common property. An. Report of Int. Dept., 1897, pp. 71, 72.
At the various sittings of the commissioners in the nation for the purpose of ascertaining the identity of the persons entitled to be placed on said roll the Cherokee Nation was represented by its attorney. The commissioners completed' the roll, which was thereafter known as the Kem-Clifton roll, and it was approved by the Secretary of the Interior on the 18th day of January, 1897, and in the month of February, 1897, the moneys then available for distribution were paid to the persons so placed by said commissioners on said roll. No exception was at that time taken by any of the parties to this cause to the action of the commissioners or to the action of the Secretary of the Interior in making and approving said roll and in paying said moneys.
By section 21 of an act known as the Curtis Act, approved June 28, 1898, 30 Stats., 495., the Dawes Commission (theretofore created for more general purposes) was directed to take the roll of Cherokee citizens of 1880 — not including freedmen — as a basis; but respecting the roll of freedmen that section provided that “ it shall make a roll of Cherokee freedmen in strict compliance with the decree of the Court of Claims entered the 3d day of February, 1896.”
By the act of July 1, 1902, 32 Stats., 716, Congress provided for the allotment of Cherokee lands to all Cherokee citizens living on September 1, 1902, and provided in sections 25 and 26 for the classes of persons tó be enrolled and those who should not be enrolled. But by section 27 Congress also provided that “ such rolls shall in all other respects be made in strict compliance with the provisions of section 21 of the act of Congress approved June 28,1898.” This referred to the freedmen.
The Dawes Commission proceeded to make up rolls, which were finally approved by the Secretary of the Interior March 4, 1907, but in so doing excluded from their rolls a large number of freedmen who had been enrolled under the decree of this court of February 3, 1896, supra.
*238 • At the time of the passage of the last act the Cherokee Nation owned about 4,500,00o acres of land in the Indian Territory, and there was to the credit of the nation in the Treasury of the United States $2,900,000, to which fund large sums have since been added.
By the supplemental petition now being prosecuted it is made to appear that in the further distributions of moneys and in the allotments of lands now about to be made by the ■ Secretary of the Interior petitioners are about to be excluded from participation therein in disregard not only of the acts of June 28, 1898, and July 1, 1902, ante, but in violation of the decree of this court which prohibited the defendants as trustees from making any discrimination between Cherokee citizens of blood or parentage and Cherokee citizens who are or were freedmen. It is alleged that the directions of these statutes and of the decree have been disregarded in making rolls, which now have the effect to deprive petitioners of rights conferred by the decree under the treaty. The rolls which have this effect have been prepared from original testimony produced before the commission making these last rolls. The court finds that rolls of freedmen have been made including persons not on the court’s roll and excluding persons on the court’s roll.
Defendants say that petitioners whose names do- not appear on the last-mentioned rolls had been permitted in many cases to make tentative allotment selections, so as to protect their homes and interests pending the final determination of their right to enrollment, but that these tentative allotment selections have been canceled and their right to enrollment denied. The specific defense made is “The probability that most, if not all, of the land held by freedmen claimants who have been rejected by the Secretary of the Interior has been allotted ” to others.
But this means a mere tentative allotment; a mere paper designation.
Nevertheless, the Secretary of the Interior has not removed from these lands any freedmen claimants whose claim for citizenship was pending, nor has any action been taken to place other allottees in possession of land now being held by persons claiming freedmen citizenship whose enrollment has been denied.
*239 It will thus be seen that there are some freedmen in possession of Cherokee lands whom defendants have not ousted, who are persons claiming under the ninth article of the treaty of 1866 whose rights apparently were fixed by the decree of February 3, 1906, and the action taken under that decree.
The objections to the action of the court relate to the jurisdiction to entertain the supplemental petition and in not holding that the jurisdiction conferred by the act, 26 Statutes, 636 (under which the decree was rendered), had, been exhausted upon the entry of the decree under the act.
The considerable number of people claiming and the necessities of many of them, who, it appears, live on the land claimed, together with the delay of the executive department of the Government in taking action (while denying the right of petitioners to the land, but meantime taking no steps to put them off), in connection with the presentation of certain alleged new matter affecting the rights of the parties, impose a review of the issues, especially as it is now argued that the legislation subsequent to the decree here has been interpreted by other courts against the right of the judiciary to interfere. These reasons and the very extensive interests involved seem to make necessary this opinion.
The act of October 1, 1890, 26 Stat., 636, which conferred the jurisdiction, had two purposes. Its first and main purpose was to determine what the rights of the freedmen in the common property of the Cherokee Nation were, and, secondly, to enforce the distribution of such property as could then be distributed among those properly entitled. The court decreed that the freedmen and free colored persons, and their descendants living and in being May 3, 1894, were entitled to participate in the common property in the same manner as citizens of the blood. Then came the injunction directed to the trustees against making any dis-criminations against this class “m future distributions The immediate distribution of money per capita derived from a sale of a part of the common land interest was subordinate to the larger question.
At the time of the original act conferring jurisdiction the United States had not made the purchase of what was known *240 as the Cherokee Outlet. That purchase was after the filing of the original petition in this case. The purchase of the Cherokee Outlet from the Cherokee Nation was by an act approved March 4, 1893, 27 Stat., 640. By an amended petition the freedmen secured the early possession of their share in that fund. The decree extended to their claim in full as set forth in their original and amended petitions.
It is evident, then, that the original and amended petitions were filed with a double object: (1) To establish the rights of the freedmen as joint owners with all other citizens of the Cherokee Nation in and to the common froferty; (2) to secure the immediate payment to them of such portion of that fund as was then available.
The decree of the court recognized the double purpose of the statute providing (1) for payment to freedmen per capita of sums equal to the amount which they would have received if they had participated in previous payments to the members of the Cherokee Nation, and of sums which would make them jiarticipate equally in payments then about to be made; (2) in addition, that the freedmen be “entitled to participate hereafter in the common property of the Cherokee Nation in the same manner and to the same extent as Cherokee citizens of Cherokee blood or parentage, and that in the distribution of the proceeds and avails of the public domain or common property of the nation * * * the United States as trustee of the Cherokee Nation he enjoined and prohibited from malting any discrimination.”
The decree did not perform its full office with the distribution of the particular fund, because in addition to providing for that distribution it also provided that these same distributees, “ those living and in being on the third day of May, 1894” and of course their descendants, should thereafter participate in any division of the common property. The decree did not fully perform its office until this latter direction could be accomplished.
The jurisdictional act is broad, and the decree of the court under it is necessarily as broad as the statute. The court took jurisdiction as a coizrt of equity. The freedmen were wards with rights theretofore denied to them. It would now be anomalous to hold that the court can make no final decree *241 for the protection of these parties. Refusal to do so would be tantamount to the court’s refusal to take the full jurisdiction conferred upon it by the statute. The general rule is that the decree of a court of equity is not final so long as there remains anything to be done touching the parties or the subject matter of the controversy. The court took that view; when it declared that “ the court reserves the right to make all such further orders in aid hereof as to it may seem meet.”
The subject matter to be included in any recovery embraced “ all moneys due either in law or equity and unpaid to the * * * freedmen which the Cherokee Nation have before paid out, or money herafter paid per capita in the Cherokee Nation, and which was, or may be, refused to or neglected to be paid to the * * * freedmen by the Cherokee Nation, * * * and for all moneys, lands, and rights which shall appear to be due to the said * * * freedmen under the provisions of the aforesaid articles of the treaty.”
The Supreme Court held, in Pam-To-Pee v. United States, 187 U. S., 382, that “ the jurisdiction of a court is not exhausted by the mere entry of a judgment. It always has power to inquire whether that judgment has been executed.” In rendering judgment under the act conferring this jurisdiction the Court of Claims has the authority to inquire into the execution of its judgment, without which, according to the court of last resort, it would be shorn of a part of the ordinary jurisdiction of a court. Any judgment rendered under the jurisdictional act in this case was the subject matter of appeal Avliere either party was dissatisfied.
The decree of February 3, 1896, resulted from a previous decree with which the parties to the litigation were dissatisfied. The final decree of February 3, 1896, was entered by the consent of all the parties involved. For that reason there was no appeal. But the issues had been actively litigated, and when the court undertook the duty of identifying the individuals entitled to share in everything that was to be allotted or distributed the defendants made no objections and acquiesced in the terms of the decree for the distribution of that part of the property then ready to be distributed. There was nothing in the terms of the decree or in the conduct of the parties affected by it to raise the *242 inference that its language did not apply to all future distributions of property, to which the complainants in that suit were entitled to have and enjoy whenever such loroperty was ready for distribution.
As in Pam-To-Pee’s case, sufra, this court understood that the act conferring jurisdiction conferred authority not only to fix the rights of the parties, “ but also to identify the individuals entitled to share therein.” 187 U. S., 382, supra.
The decree went as far as it could at the time in carrying out both purposes of the act conferring jurisdiction. The secondary purpose was necessarily subordinate to the primary object and followed in course when it was determined that the freedmen possessed property rights as Cherokee citizens. The distribution of the comparatively small sum of money derived from the sale of the Cherokee Outlet did not operate to prevent the court from reserving in specific language the right to continue its jurisdictional supervision, so that the freedmen might continue to obtain “from the Cherokee Nation the moneys due either in law or equity and unpaid to the * * * freedmen, which the Cherokee Nation have before paid out, or may hereafter pay, per capita, in the Cherokee Nation, and which was, or may be, refused to or neglected to be paid to the said * * * freedmen.”' That was the language of the decree. The right to enforce its decree continued to exist without reservation expressed; but it is not for a court which enters such a decree to make its terms and leave the parties declared entitled to redress without remedy after fixing rights which, with the entry of the decree, could only be partly satisfied.
Nearly a million dollars was distributed by virtue of the decree of 1896. Three times after the passage of the decree the court took steps to carry it out: (1) The court remitted to the Secretary of the Interior, as its agent, certain details with limitations relating to some objections of counsel. (2) The court construed this decree so as to make the limitation with regard to residence or return within six months apply to freedmen as well as free colored persons, and fixed the date of the expiration of the six months as February 11,1867, instead of January 19,1867. (3) The court refused to include freedmen who, for various reasons beyond their control, had *243 been unable to return within sis months. Thus the court continued its jurisdictional supervision without interfering with the discretion of the Secretary of the Interior or of the commission so long as no complaint was made that he or the commission were violating the terms of the decree. It is apparent, then, that an extraordinary mistake was made in the distribution of the large sum of. money then due as the result of the action of the commissioners who made up the Kern-Clifton roll, with the administrative approval of that roll by the Secretary of the Interior — the United States, as trustee, and the Cherokee Nation consenting and the court affirming — if now it shall be made to appear that these same distributees can not be heard to claim enrollment for distributions of money and allotments of land now ready to be made.
The general rule is that jurisdiction continues so long as there are parties and subject matter unless the authority conferring the jurisdiction has taken it away. Defendants contend that this has been done, and in support of this contention we .are referred to Wallace v. Adams, 204 U. S., 415.
There a citizenship court had been established to determine who were citizens of the Choctaw Nation. The jurisdiction of that court was taken away by an act expressly abolishing the court. That was within the plenary power of Congress,.
This case is essentially different. It nowhere appears that Congress has interfered with the jurisdiction here, or with the decree of this court, unless the act of 1890 (under which the decree of the court was rendered in 1896) has been repealed by implication by subsequent legislative acts.
This brings us to a consideration of the jurisdiction of the court as affected by the acts of 1898 and 1902, swpra.
We haire seen that when the partition of the common property came to be made among the citizens of the Cherokee Nation per capita, which included the freedmen, the Dawes Commission was ordered “ to make a roll of Cherokee freedmen in strict compliance with the decree of the Court of Claims rendered the 3d day of February, 1896,” section 21. This direction was supplemented by the act of July 1, 1902, which provided that “ such rolls shall in all other respects be made in strict compliance with the provisions of section 21 of *244 the act of Congress approved June 28, 1898, 30 Stat., 495, and the act of Congress approved May 31, 1900, 31 Stat., 221,” section 27.
The act of July 1, 1902, provided that only those be enrolled who were citizens on September 1, 1902. The Kern-Clifton roll, as directed by the decree of'this court February 3, 1896, was to embrace those living and the descendants of those living as of May 3, 1894. We have said, and we again say, that it must be taken as adjudicated that the Kern-Clifton roll omitted all who had lost their citizenship prior to May 3, 1894. The act of July 1, 1902, was evidently intended to exclude those who had lost their citizenship after May 3, 1894, and before September 1, 1902, for in all other respects the roll was to be made in strict compliance with the decree of this court.
We are bound to presume that the Kern-Clifton roll was made in compliance with the decree, because the decree was entered by consent, and because the Cherokee Nation and the beneficiaries whose names appeared on that roll entered into an agreement for distribution to be made under it. As a matter of fact, distribution was made under it, and there is nothing to show that the Kern-Clifton roll was ever questioned until the supplemental petition had been filed herein. If the payment by the Secretary of the Interior was a “ compliance ” with the provision of the decree for the payment of money, the refusal of the Dawes Commission to allow these same persons to participate in the common property, as further provided in the decree, is not a “ strict ” compliance, nor, for that matter, a compliance of any kind.
The intent of Congress is plain that the decree of the court should not be ignored in all prospective or future distributions of communal property. But, of course, the court has yet the power to disregard the Kern-Clifton roll and direct an entirely new roll to be made if proof be submitted which shall satisfy the court that the Kern-Clifton roll was fraudulent. But we do not think that the court can be justified on the mere suggestion that the roll is fraudulent in disregarding the evidences presented by that roll of the citizenship of the parties as of May 3, 1894.
*245 The first and chief and fundamental provision of the foregoing acts is the requirement that the future and final roll of Cherokee freedmen must be “ in strict compliance with the decree of the Court of Claims rendered February 3, 1896.” These directions contain more than an ordinary statutory provision, because they embrace the declaratory principle of the acts.
In the passage of section 21 of the Curtis Act and section 27 of the act of July 1, 1902, supra, Congress have said in effect: At last some of the vexed questions of Indian rights have been settled judicially, and it is our legislative will that they shall remain settled. We have not lessened or changed or interfered with the judicial ascertainment of the rights of these parties, and what we have not done ourselves we will not empower another branch of the Government to do. Thereupon it is the congressional will that the administrative officers who will have these matters in charge in future proceedings must act in ascertaining who are entitled “ in strict compliance with the decree of the Court of Claims rendered February 3,1896,” as a basis to carry out its work for a later date.
The provisions of these two acts of Congress which follow the specific direction relating to freedmen are merely directory; that is, they relate to the duties of officers and not to the rights of parties. There is no legislative intent apparent to take away the judicial ascertainment of legal rights of the parties and submit them to the future ex parte action of administrative officers. These provisions must be kept subordinate to the chief purpose of the statute and interpreted “ in strict compliance ” with the preceding section and “ with the decree of the Court of Claims.” The Dawes Commission was not a judicial body. No party was sure of a hearing before it; its action was subject to the approval of an executive officer, and its legislative object was not to ascertain rights, but to assist individuals to obtain rights already existing. It was in legal effect a designation of administrative officers to do administrative work.
Where parties are rightfully entitled to judicial redress and there is confessedly no other jurisdiction into which they can go, a court having the parties before it already should *246 continue to exercise jurisdiction and should not interpose doubts and artificial refinements to save itself from the responsibility of decision.
Congress originally intended that this court should determine all questions of property rights between the Cherokee Nation and the Cherokee freedmen, and Congress subsequently gave that construction to the decision of the court and apxiroved and ratified it. Any conclusion which will now deprive claimants of the judicial ascertainment of their rights as embodied in and expressed by the decree will be contrary to the expressed intent of Congress.
The Dawes Commission was subordinate to the Secretary of the Interior, and was merely one of the agencies given to enable him to perform the duties of his office. The duties of the Secretary were ministerial, inasmuch as he was directed to make up a roll of a slightly different date, but “ in strict compliance with the decree of the Court of Claims.” The subordinate agency relied upon to carry out the Secretary’s own ministerial work could not be judicial if his work was merely ministerial, as we think it was.
Section 21 of the act of 1898 confirmed the u authenticated ” or census roll of 1880 as a basis for the new roll except as to freedmen. In the proceedings leading up to the decree of February 3,1896, the Cherokee Nation had insisted that the freedmen and free colored persons should be restricted to those names found upon said “ authenticated ” or census roll of 1880. The decree secured to the freedmen a confirmation of the roll of 1880 as far as that roll went, but permitted the additional enrollment of freedmen and free colored persons who had been wrongfully left off the roll of 1880 by the Cherokee Nation. Accordingly, when Congress excepted freedmen it must have been because those bodies intended that the Dawes Commission should make another roll so as to comply with the decree of the court, inasmuch as in the concluding paragraph of the section the commission was instructed to make its freedmen roll in strict compliance with our decree. When the act of 1898 was approved by the President, if the jurisdiction conferred upon the court by the act of 1890 was impaired, no other evidence can be found of repeal except the direction contained in the act for the Dawes Commission to obey the decree of the court.
*247 Section 21 of the act of 1898 was a ratification by Congress of the refusal of the court to restrict the roll directed by the decree of 1896 to be made — which became the Kern-Clifton roll — to the freedmen census as made by the Cherokees alone; and section 27 of the act of 1902 was a further ratification of the court’s action. While by the acts of 1898 and 1902 the Kern-Clifton roll was not adopted as final, the decree which provided for it by way of supplement to the roll of 1880 intended to make it final. The Kern-Clifton roll which resulted was necessarily before the Dawes Commission subject to corrections for fraud or mistake in the matter of the identity of freedmen living and in being on the 3d day of May, 1894, to which additions were to be made as of the 1st day of September, 1902, as provided by the act of duly 1 of that year.
There is no proof that the Kern-Clifton roll was made in disregard of the decree. Presumptively it was correct, not only because there were no exceptions filed to it, but it came to the court with the approval of the Secretary of the Interior as including the names of all freedmen erroneously omitted by the previous Cherokee census. There may have been mistakes in the Kern-Clifton roll, and doubtless were. But the jurisdictional act out of which grew the work of the Kern-Clifton Commission included jurisdiction not only to define rights but to identify individuals entitled to share in these rights. 187 U. S., 382, supra.
Congress in 1898 rejected an amendment offered to the Curtis Act which if adopted would have made it the duty of the Dawes Commission to place on its rolls not only those names found on the Kern-Clifton roll, but to add to that roll “the names of all persons who applied before the commission that made the roll of freedmen in said case (Kern-Clifton) and whose names were not placed upon either said roll or the rejected roll of freedmen made by said commission in said case, if in their (Dawes Commission) judgment the evidence offered before said Commission to the Five Civilized Tribes justified their being made citizens of the Cherokee Nation in accordance with the provisions of said decree.”
This amendment was designed to open the door to those freedmen who had been found by the Kern-Clifton Commis *248 sion not to be entitled to citizenship. Had the amendment been adopted jurisdiction would have been taken away .from the Court of Claims, because the Dawes Commission, instead of making its roll in strict compliance with the decree of the court, could have made it to' be what in their judgment this court ought to have made it. The fact that Congress refused to adopt the amendment and restricted the Dawes Commission to make a roll in strict compliance with the decree of the court shows that it was not the purpose to take jurisdiction from the court.
Section 2 of the act of April 28, 1906, 34 Stat., 137, provided for the completion of the rolls on or before March 4, 1907. Section 3 of that act provided that the roll of Cherokee freedmen should include only such persons of African descent, either free colored or the slaves of Cherokee citizens, and their descendants who were actual, jiersonal, bona fide residents of the Cherokee Nation August 11, 1866, or who actually returned and established such residence in the Cherokee Nation on or before February 11, 1867. This provision was not to prevent the enrollment of any person who had theretofore made application to the Dawes Commission and who had been adjudged entitled to enrollment.
The language of the court’s decree of February 3, 1896, had been such as to raise, the question whether freedmen, as well as free colored persons, were subject to limitation of residence or return, and it also left in doubt whether the six months expired January 19, 1867, or February 11, 1867. These doubts had been resolved by the language of the decree of February 18, 1896, and the language of this section in the act of April 26, 1906, is almost precisely the same with that of the decree. In his argument of this case counsel for the Cherokee Nation stated that he had drawn this section and procured it to be included in the act, and that his reason for this was that the Dawes Commission was placing, or was about to place, on the roll of freedmen certain persons who were not actual residents of, or who did not actually return to, the nation within the time prescribed by the treaty, because for various reasons they were considered by the Dawes Commission to have been constructive residents or to have constructively returned. Thus, the act of *249 1906 bas practically reenacted the decree of the court, and this act can not be taken as superseding the direction of the court with respect to the manner in which the final roll should be made up.
There is no purpose apparent on the face of the last act to interfere with the decree or the direction given to carry out the decree.
With the positive directions embodied in the acts of 1898 and 1902, under which the Dawes Commission had been operating for several years in making up the final rolls of Cherokee freedmen, to act in strict compliance 'with the decree of the court there is no room for the inference that the act of 1906 directed any change in the methods directed to be made.
It is elementary that repeals by implication are not favored. They are never admitted where former directions can stand with the new act, but only where there is positive repugnancy between the two and where both acts can not be reconciled. United States v. Greathouse, 166 U. S., 601. This section of the act of 1906 was prepared at the instance of the attorney for the Cherokee Nation (so conceded at the argument) and could not have been intended to take away the jurisdiction of the court by practically affirming language requiring the Dawes Commission to obey the terms of the court’s decree and by using definitions which had their origin in the orders construing the decree of February 3, 1896 — language which defined the rights of freedmen and free colored persons to be the same, and language which fixed the date of the expiration of the six months as of February 11, 1867, instead of January 19, 1867.
As further showing the intent of Congress not to depart from the directions given to secure a perfect roll, it appears that, pending the passage of the act of April 26, 1906, supra, an amendment was offered which provided for the enrollment of colored persons “who were taken from the nation or driven therefrom under circumstances which were beyond their control, and who did not, subsequent to August eleventh, eighteen hundred and sixty-six, make applications for citizenship in any other tribe.” But this amendment was rejected. Its acceptance would have permitted the enrollment of those persons whom this court, by order of April 15,1896, *250 ordered the Kern-Clifton Commission to reject. Cong. Rec., Jan. 18, 1906; H. bill 5976, 1st sess. 59th. Cong.
Some decisions have been cited in support of the proposition that the jurisdiction of this court ended with the decree of February 3, 1896, and that exclusive jurisdiction was conferred upon the Dawes Commission to make a roll, subject only to the supervision of the Secretary of the Interior. If these cases have any effect at all upon the decree they also supersede the provisions of section 21 of the act of 1898 and section 27 of the act of July 1,1902.
In Buffington's case, Ann. Rep. Int. Dep., 1904, pt. 2, p. 161, proceedings were instituted to compel the Secretary of the Interior to confine the Dawes Commission to the enrollment of those freedmen found on the authenticated or census roll of 1880, which would have been in violation of the decree of the Court of Claims. The bill was dismissed with the statement that the jurisdiction of the Court of Claims had ended. This concluding statement was obiter dicta and not necessary to the decision of that cause.
In Kimberlin's case, 104 Fed. Rep., 716, it was said that the Dawes Commission was invested with judicial power, from which we are to infer because of that statement that its jurisdiction superseded that of the Court of Claims. But in Wallace v. Adams, 204 U. S., 415, the same learned judge defined the commission to be a part of the executive branch of the Government. That is what we think of its status. The Supreme Court thought so, too, as the Wallace case was affirmed by the Supreme Court.
Congress, by section 25 of the act of 1898, 30 Stats., 495, authorized the Delawares to bring a suit in this court against the Cherokee Nation and the United States for rights not adjudicated to them in the case of Journeycake, 155 U. S., 196, which had been decided in this court under the jurisdictional act of 1890 — under which the court is proceeding in this case. It is now contended that because that act was passed it was necessary to have been passed before the Delawares could have authority to maintain their second suit, and because the act was passed with reference to the Delawares it is now necessary that a similar act be passed with *251 reference to the freedmen before these proceedings can be maintained by them.
In entertaining jurisdiction under the provisions of section 25 of the act of 1898 the Supreme Court decided that the decree in Journeycake’s case was proper so far as it went. The decree in that case, while it had fully defined and established the rights of the Delawares in the common property of the nation, had not extended to the special or peculiar rights which would remain in such original or registered Delawares as might be surviving when that property should come to be distributed, though its jurisdiction was broad enough to have permitted it to do so. That was the only question decided in the second Delaware case, 193 U. S., 127, and it might have been decided in the first case without exceeding the jurisdiction conferred by the act of 1890.
The supplemental petition of the freedmen does not seek to have new rights defined, but does seek to have established rights enforced.
It is again contended that since Congress has provided that the action of the Secretary of the Interior in approving the Dawes rolls shall be final the court can not now disturb it. But in Goldsby's ease, 211 U. S., 249, it appeared that the Secretary had finally approved the Dawes rolls without including Goldsby, who thereupon sought to compel the Secretary to place his name on the rolls notwithstanding the fact that the rolls had been finally approved. The Secretary was ordered to enroll Goldsby, and this judgment was affirmed by the Supreme Court. Mr. Justice Day, for the court, declared that—
“ We appreciate fully the purpose of Congress in numerous cases of legislation to confer authority upon the Secretary of the Interior to administer upon Indian lands, and previous decisions of this court have shown its refusal to sanction a judgment interfering with the Secretary where he acts within the powers conferred by law. But, as has been affirmed by this court in former decisions, there is no place in our constitutional system for the exercise of arbitrary power, and if the Secretary has exceeded the authority conferred upon him by law, then there is power in the courts to restore the status of the parties aggrieved by such unwarranted action.”
*252 Under these decisions we do not see the application of the last case invoked by the defendants. Garfield, Secretary of the Interior, v. United States ex rel. Lowe, 34 D. C. App. The only question determined in Lowe’s case was that after the partial list of rolls had been sent up by the Dawes Commission and approved by the Secretary of the Interior, he still had the right after notice and hearing and upon proof of fraud to strike from these rolls the names of persons improperly placed upon them by the Dawes Commission. The learned judge delivering the opinion in the Lowe case does not seem to have had Iris attention directed to any of the questions involved in the present matter and particularly to the express injunction contained in section 21 of the act of 1898 that “ they shall make a roll of Cherokee freedmen in strict compliance with the decree of the Court of Claims.”
It remains to more fully consider whether a proceeding by mandamus be the proper remedy, if there be a remedy for these petitioners in another jurisdiction rather than the present proceeding under the supplemental petition.
It has been suggested that if rights have been conferred upon the freedmen by Congress since the jurisdictional act of which they have been denied, then their remedy is by mandamus rather than by a renewal of their action in this court.
But it is manifest that since the decree of February 3,1896, no new rights have been conferred. Petitioners’ first suit was not an action at law brought to recover damages, but a suit in equity prosecuted by them as beneficiaries of a trust against a trustee for the execution of that trust. As the decree of February 3, 1896, has never been satisfied, its terms have not been exhausted.
In Anderson v. United States, 9 Wall. R., 56, there was presented the proposition “ that the Court of Claims had no authority to render judgment for a specific sum, the power of the court being limited to the point of deciding whether the claimant was entitled to recover at all, leaving the amount to be determined by computation by the proper officers of the Treasury Department.” The contention'there was analogous to the contention now made in this case. But the court declared that to sustain the position contended for in Ander *253 son’s case would require the appellate tribunal to hold that Congress intended to constitute this court (having power to render the decree) a mere commission, which contention was disposed of by the further declaration of the court that it would “ not attribute to Congress a purpose that would lead to such a result, in the absence of an express declaration to that effect.”
This court has the undisputed power not only to decree the payment of money from the Treasury — which necessarily involves the power to carry out a decree for that purpose — ■ but, as provided by section 1070 of the Revised Statutes, may exercise such powers as are necessary to carry into effect the powers granted to it by law.
Mandamus is a legal remedy for a legal right granted where there is no specific legal remedy and to prevent that defect of legal justice which would otherwise ensue. Brown v. United States, 6 C. Cls. R., 187. The writ is a remedy to compel any person, corporation, public functionary, or tribunal to perform some duty required by law where the party seeking relief has no other legal remedy. Knox County v. Aspinwall, 24 How., 376. It is granted to a party where the law affords him no other adequate means of redress. Kendall v. Stokes, 3 How., 87. But it is not the remedy under the conditions of this case. Nor do we think that it is any remedy at all in any other forum where it appears that this court has entered its decree fixing rights now denied. We can not abandon the decree and its consequences and leave the parties without redress if rights fixed by the decree are shown to the court to have been denied. At least it is not for this court to say so.
In requiring the Dawes Commission to adhere strictly to the decree of this court in making a roll there is no indication that the appropriate remedy may not be invoked if it reasonably appears that there has been a departure from the directions of Congress. Certainly where two special jurisdictions appear to have been created by acts of Congress for special purposes, one of them possessing judicial power in a constitutional sense and the other not invested with that kind of power, persons whose rights are affected should have the benefit of a decree fixing and establishing their rights in *254 such substantial form that the administrative body without judicial power can not ignore. Especially is this so in the face of the positive declarations of Congress that the special body named by subsequent legislation must observe the adjudication of the court having original jurisdiction. If there be a doubt as to the right of the Court of Claims to carry out the original and repeated intention of Congress— which intention seems never to have been abandoned — they should have the benefit of such doubt. s
The court is of opinion that a decree should now be entered requiring the Secretary of the Interior to give to those freedmen and free colored persons whose names were placed upon the Kern-Clifton roll in obedience to the decree of this court, but were omitted from the Dawes Commission roll full participation in the distribution of the property of the Cherokee Nation.