Ray M. ROBINSON, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 216–82.

United States Claims Court.

Dec. 21, 1984.

Ray M. Robinson, Thelma M. Robinson Vance and Troy L. Robinson, pro se.

James T. Draude, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

SPECTOR, Senior Judge.

This case is before the Court on defendant's Motion for Summary Judgment and plaintiffs' opposition. The facts are not materially in dispute. At issue is the interpretation of various treaties, acts of Congress, and decisions of the predecessor of this court (U.S. Court of Claims) with regard to the rights of the so-called Cherokee freedmen and their descendants to share in the distribution of proceeds from the sale of tribal property. Defendant argues that the Court lacks jurisdiction over this case and, alternatively, that plaintiffs' claims are barred by the doctrine of *res judicata.*

### Introduction

Plaintiffs contend that their grandfather was among a group of free Negroes and former slaves (known collectively as the Cherokee freedmen) who were residing in the Cherokee Nation at the end of the Civil War. It is claimed that he became a citizen of the Cherokee Nation under Article IX of the treaty of July 19, 1866 between the United States and the Cherokee Nation. Plaintiffs allege further that their grandfather, and five of his children, were thereafter wrongfully denied citizenship in the Cherokee Nation in the early twentieth century with the result that they did not receive allotments of land nor share in tribal funds distributed to members of the Cherokee Nation at that time.

Plaintiffs' claims are derived from their ancestors, beginning with their grandfather, William H. Robinson. William H. had ten children, and plaintiffs claim funds and property through five of those children, namely Jim John, Nicey, Olive, and William D. Robinson.

Plaintiffs Ray M. and Thelma M. Robinson are the son and daughter of the above-mentioned Jim Robinson and Bessie L. Tallaferro. Plaintiff Troy L. Robinson is the son of the above-mentioned John Robinson and Clara Miller.

### Statement of Facts

At the time of the Civil War, individual Cherokees "owned" Negro slaves. In addition, there were a number of free Negroes who lived with the Cherokees. For the first months of the war the Cherokee Nation remained neutral. However, as the war progressed the Cherokee Nation abandoned its neutral stance and signed a treaty of friendship and alliance with the Confederate States. This treaty unilaterally

annulled all prior treaties between the Cherokee Nation and the United States.

At the conclusion of the War, President Andrew Johnson appointed a commission to negotiate a treaty with, among others, the Cherokee Nation. Those negotiations led to the treaty of July 19, 1866 between the Cherokee Nation and the United States.[1] Among the provisions of that treaty were sections detailing the rights of former Negro slaves and free Negroes living in the Cherokee Nation. Article IX of the 1866 treaty provides in pertinent part as follows:

The Cherokee nation having voluntarily, in February, eighteen hundred and sixty-three, by an act of their national council, forever abolished slavery, hereby covenant and agree that never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the members of said tribe alike. They further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees: *Provided,* That owners of slaves so emancipated in the Cherokee nation shall never receive any compensation or pay for the slaves so emancipated.[2]

In 1866, the Cherokees amended the constitution of the Cherokee Nation to provide, *inter alia,* as follows:

SEC. 2. The lands of the Cherokee Nation shall remain common property until the national council shall request the survey and allotment of the same, in accordance with the provisions of article 20th of the treaty of 19th of July, 1866,

between the United States and the Cherokee Nation.

SEC. 5. No person shall be eligible to a seat in the national council but a male citizen of the Cherokee Nation, who shall have attained to the age of twenty-five years, and who shall have been a bona fide resident of the district in which he may be elected at least six months immediately preceding such election. All native-born Cherokees, all Indians, and whites legally members of the nation by adoption, and all freedmen who have been liberated by voluntary act of their former owners or by law, as well as free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants who reside within the limits of the Cherokee Nation, shall be taken and deemed to be citizens of the Cherokee Nation.

Thereafter, the Cherokees treated the freedmen as members of the Cherokee Nation with all the rights of native Cherokees.

However, by an act approved on April 27, 1886, the Cherokee National Council enacted and declared that the rights conferred upon the Cherokee freedmen by Article IX of the 1866 treaty were limited to civil, political and personal rights and did not include any right or title to the Cherokee common lands or any proceeds therefrom.[3] Accordingly, the Cherokee Nation distributed the proceeds from the sale of common lands only to "Cherokees by blood," excluding the freedmen.[4]

*Subsequent Litigation*

In the Act of October 1, 1890, 26 Stat. 636, Congress conferred jurisdiction on the U.S. Court of Claims to determine the legal and equitable rights of the freedmen under the provisions of Article IX of the 1866 treaty. In accordance with the 1890 Act,

---

1. 14 Stat. 799 (1866).

2. 14 Stat. 801 (1866).

3. *See Moses Whitmire, Trustee v. The Cherokee Nation and the United States,* 30 Ct.Cl. 138, 152–53 (1895).

4. *Id.* at 159.

158

Moses Whitmire, a trustee for the Cherokee freedmen, filed suit in the U.S. Court of Claims to recover the freedmen's proportionate share of moneys derived from the sale of Cherokee lands.[5] The aforementioned William H. Robinson, plaintiffs' grandfather, was a party to the Whitmire litigation.

The U.S. Court of Claims found that under Article IX of the 1866 treaty, the Cherokee freedmen possessed the same rights as blood Cherokees, including equal rights to property and any proceeds.[6] However the court found the record insufficient to determine the number of Cherokees who had previously received distributions and the number of freedmen claimants.[7]

Thereafter, the court held that a census taken by the United States of the Cherokee Nation, including freedmen, (known as the Wallace Roll) established the total number of freedmen (3,524) entitled to share in previously distributed Cherokee funds.[8] The court entered its decree directing the Secretary of the Interior to pay the individuals listed on the Wallace Roll, with some modifications.

Both parties appealed the decree. However, they stipulated to a withdrawal of their appeals upon entry of an agreed upon revised decree, which the Court of Claims issued on February 3, 1886.[9]

The court's decree authorized the Secretary of the Interior to prepare a new roll of freedmen, which then became known as the Kern-Clifton roll. The Secretary of the Interior approved the Kern-Clifton Roll on January 18, 1897, and the award in *Whitmire* was then distributed to all persons appearing on that roll, including plaintiffs' ancestors.

In 1893, Congress established the so-called Dawes Commission to negotiate the extinguishment of tribal title to land so that a territory could be created and admitted as a state of the Union.[10] Subsequent to the entry of the decree in the *Whitmire* case, Congress directed the Dawes Commission to prepare a roll of freedmen entitled to citizenship in the tribes.[11] The Act further provided that:

[T]he rolls so prepared by them [the Dawes Commission] shall be hereafter held and considered to be the true and correct rolls of persons entitled to the rights of citizenship in said several tribes ...[12]

Section 31 of the Act of July 1, 1902 provides that "No person whose name does not appear upon the roll prepared [by the Dawes Commission] as herein provided shall be entitled to in any manner participate in the distribution of the common property of the Cherokee tribe ..."[13]

Plaintiffs' grandfather William H. Robinson and his wife and children applied to the Dawes Commission for enrollment as Cherokee freedmen. After taking testimony, the Dawes Commission rejected their applications. The Secretary of the Interior approved the Commission's decision on the Robinson family application. The Robinsons filed a motion for a rehearing, which was denied.

The Secretary of the Interior finally approved the Dawes Commission roll on March 4, 1907. The roll included some persons not on the Kern-Clifton roll and omitted persons (including plaintiffs' ances-

5. *Id.*

6. *Id.* at 155–157.

7. *Id.* at 159.

8. *Moses Whitmire, Trustee for the Cherokee Freedmen v. The Cherokee Nation and the United States*, 30 Ct.Cl. 180, 182–87 (1895).

9. *See Moses Whitmire, Trustee v. The United States and the Cherokee Nation*, 46 Ct.Cl. 227, 234, 241 (1911).

10. Act of March 3, 1893, c. 209, 27 Stat. 612, 645–46 (§ 16).

11. Act of June 10, 1896, c. 398, 29 Stat. 321.

12. 29 Stat. 339 (1896).

13. 32 Stat. 721 (1896).

tors) who were on the Kern-Clifton roll in accordance with the court's decree in *Whitmire*. The Robinsons, therefore, did not participate in any further distributions.

In 1909, the Cherokee freedmen filed a supplemental petition in the *Whitmire* case contesting the Dawes Commission's omission of 1,200 freedmen who appeared on the Kern-Clifton roll.[14] The court found in favor of the omitted freedmen, stating that the Kern-Clifton roll governed the past and future distributions from common property of the Cherokee Nation.[15]

On January 29, 1912, the U.S. Supreme Court reversed that decision of the Court of Claims.[16] It held that Congress had authority to prescribe a means of distribution other than the Kern-Clifton roll and that Congress had done so by directing the Dawes Commission to prepare a new roll.[17]

In 1964, various descendants of individual Cherokee freedmen filed suit in the Court of Claims.[18] Plaintiffs Ray M. Robinson and Thelma M. Robinson herein were also plaintiffs in that case. John S. Robinson and Clara L. Miller, who appear as plaintiffs in the 1964 case, are the parents of present plaintiff Troy L. Robinson. The plaintiffs in that suit alleged jurisdiction under the 1890 Act and the Indian Claims Commission Act, 25 U.S.C. § 70 *et seq.*, and claimed that the Dawes Commission and the Secretary of the Interior wrongfully excluded plaintiffs and their ancestors from the rolls of the Cherokee Nations and wrongfully denied them allotments of land and a share of tribal funds. Plaintiffs requested restoration of "all of the lands, including agricultural, oil and all other mineral rights" to which plaintiffs and their ancestors were entitled.

On April 5, 1965, the Court of Claims granted summary judgment for defendant, ruling that:

(1) to the extent that plaintiffs' claim is based on the Indian Claims Commission Act, the claim accrued long prior to August 13, 1946, and this court has no jurisdiction of the claim under that Act; (2) to the extent that plaintiffs' petition asserts a claim under the Act of October 1, 1890 (26 Stat. 636), the claim is barred by the statute of limitations; (3) to the extent that the petition asserts claims based upon plaintiffs' alleged rights to share in the judgment rendered by the Indian Claims Commission in *Cherokee Nation v. United States*, Docket No. 173, 9 Ind.Cl.Comm. 435 (1961), the court lacks original jurisdiction to hear and to determine such claims, and (4) to the extent that the petition asserts a claim by individuals that might be cognizable under 28 U.S.C. 1491, the claim is barred by the 6-year statute of limitations, . . .[19]

## Discussion

Plaintiffs claim that the Dawes Commission and the Secretary of the Interior wrongfully excluded their ancestors, who appear on the Kern-Clifton roll, from enrollment in the Cherokee Nation as Cherokee freedmen. Plaintiffs ask the court to declare that plaintiffs, claiming through their ancestors, are entitled to citizenship in the Cherokee Nation and to an award of a money judgment against the United States for past deprivation of such rights.

Defendant urges that plaintiffs' claims are barred by the doctrine of *res judicata*. The court agrees.

 *Res judicata* ensures the finality of decisions. Under that doctrine, "a final judgment on the merits bars further claims

---

**14.** *Moses Whitmire, Trustee v. The United States and the Cherokee Nation*, 44 Ct.Cl. 453 (1909).

**15.** *Moses Whitmire, Trustee v. United States and the Cherokee Nation*, 46 Ct.Cl. 227, 242, 254 (1911).

**16.** *Cherokee Nation v. Whitmire*, 223 U.S. 108, 32 S.Ct. 200, 56 L.Ed. 370 (1912).

**17.** *Id.* at 116–117, 32 S.Ct. at 204.

**18.** *James A. Robinson, deceased, by Bessie L. Tallaferro Robinson, et al. v. United States*, 170 Ct.Cl. 897 (1965), *cert. denied*, 383 U.S. 911, 86 S.Ct. 884, 15 L.Ed.2d 666 (1966).

**19.** *Id.*

**160**

by parties or their privies based on the same cause of action." [20] The rule prevents litigation of all grounds for, or defenses to, recoveries that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceedings.[21] *Res judicata* thus encourages reliance on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes.

■ The issues raised by the plaintiffs in this case are not new. The authority of Congress to direct the Dawes Commission to produce a new roll of Cherokee freedmen to the exclusion of those on the Kern-Clifton roll, was tested and upheld by the Supreme Court. In discussing Congress' authority to call for a new roll, the court stated, in part:

> [Congress] did not accept the Kern-Clifton roll as an authentic identification of the individual freedmen. It had been challenged. It had been made up with haste and under circumstances which caused question of its correctness .... It must be borne in mind that important rights were involved and no good reason could be argued against, or serious consequences apprehended from another investigation. Those who were entitled to be enrolled could again establish their right. Those who were not so entitled and who had got on the rolls either by mistake or fraud had no legal ground of complaint.[22]

Plaintiffs' briefs are dedicated to showing that the Supreme Court's ruling was erroneous. They do not contend that the facts are different, as indeed they cannot. Both plaintiffs' grandfather, through whom plaintiffs claim, and the United States were parties to that Supreme Court decision. It follows inevitably that since a court of competent jurisdiction has previously decided the same issue between the same parties, plaintiffs are precluded under the doctrine of *res judicata* from now asserting the same grievance against the United States.[23]

*Conclusion*

Defendant's Motion for Summary Judgment is allowed, and the petition shall be dismissed.

---

**20.** *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed. 210 (1979).

**21.** *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 378, 60 S.Ct. 317, 320, 84 L.Ed. 329 (1940); 1 BJ. Moore, Federal Practice ¶ 0.405[1] (2d ed. 1974).

**22.** *Cherokee Nation and United States v. Whitmire, Trustee for Freedmen of the Cherokee Nation,* 223 U.S. 108, 117, 32 S.Ct. 200, 204, 56 L.Ed. 370 (1912).

**23.** In view of the above disposition under the doctrine of *res judicata,* it is unnecessary to treat with defendant's alternative argument of lack of jurisdiction. However, *see James A. Robinson,* note 18, *supra,* which disposed of this jurisdictional argument.