# CHEROKEE NATION AND UNITED STATES *v.* WHITMIRE, TRUSTEE FOR FREEDMEN OF THE CHEROKEE NATION.

## APPEAL FROM THE COURT OF CLAIMS.

No. 735.   Argued January 9, 10, 1912.—Decided January 29, 1912.

As after a decree of the Court of Claims in favor of the petitioner an act of Congress was passed, and the court made another decree granting the same relief, the second decree was a decision upon the effect of the subsequent legislation, and an appeal lies therefrom if taken within the time prescribed by law.

*Held,* that under the circumstances of this case, and the proceedings taken thereon, appellants' appeal was taken in time.

*Lowe* v. *Fisher, ante,* p. 95, followed as to the construction of the Cherokee Treaty of August 11, 1866, and as to the freedmen of the Cherokees and their descendants entitled to be enrolled as citizens and the power of Congress thereover, and that the Secretary of the Interior had the power, after notice and opportunity to be heard, to strike from the rolls names which had been improperly placed thereon through mistake or fraud.

44 Ct. Cl. 453, reversed.

THE facts, which involve the construction of the various treaties, acts of Congress and decisions of the Court of Claims in regard to the rights of Cherokee freedmen and their descendants to share in the distribution of tribal property, are stated in the opinion.

*Mr. William W. Hastings* for appellant, the Cherokee Nation.

*Mr. Assistant Attorney General John Q. Thompson* and *Mr. George M. Anderson,* filed a brief for appellant, the United States.

*Mr. Samuel A. Putman* and *Mr. Charles Poe,* with whom *Mr. Robert H. Kern* was on the brief, for appellee.

Mr. *Charles M. Rice, Mr. George S. Ramsey* and *Mr. C. C. Calhoun, Mr. Frank J. Boudinot, Mr. John J. Hemphill* and *Mr. Daniel B. Henderson,* filed briefs as *amici curiæ.*

MR. JUSTICE MCKENNA delivered the opinion of the court.

This appeal is prosecuted to review a supplemental decree of the Court of Claims enjoining and directing the Secretary of the Interior to enroll upon the final roll of the citizens of the Cherokee Nation for allotment of lands the names of certain persons and their descendants claiming rights as Cherokee freedmen, whose names were found upon the roll called the Kern-Clifton roll, which the decree adjudged was directed to be made by a former decree of the court. The names of those persons, who are appellees in this case, after investigation by the Secretary of the Interior, were found by him not entitled to be enrolled, and not entitled to participate in the distribution of tribal property.

The decision in *United States ex rel. Lowe* v. *Fisher, ante,* p. 95, has simplified the decision in this case. Indeed, the ultimate question in both is the same, the power of Congress over the allotment of Indian lands and the manner of ascertaining what persons shall be entitled to them. There were, however, contentions made in that case which are not made here. There are propositions of law conceded in this case which were contested in that. Therefore a brief summary of the elements necessary to a decision is appropriate.

Preceding the merits, however, motion to dismiss the appeal must be disposed of. The motion is made on the following grounds: (1) The decree of February 3, 1896, was a final decree from which no appeal was prosecuted to this court; (2) that the decree of February 20, 1911, hereafter referred to, was merely in the nature of an execution

of that of February 3, 1896, and defined no new rights, but enforced merely rights established and consented to; and (3) because, although the decree of February 20, 1911, was regularly entered on that day, the appeal now pending was not allowed or prosecuted until the seventeenth of June, 1911, more than ninety days after the entry of the decree.

The first and second grounds are untenable. The decree under review has broader application than that of February 3, 1896. It determined rights to allotments which had not then been provided for, and, assuming that it declared the principle by which such rights could be determined, there was, as we shall presently see, intervening legislation by Congress. This legislation gave rise to serious controversy. It confirmed, it was contended by petitioners (appellees here), and is yet contended by them, as we shall presently see, the decree of the court both as to the principle of the decree and also as to the means of identification of the individuals who would be entitled to rights under the principle. By the defendants (appellants here) it was contended that the legislation superseded the decree and made new provision for the identification of persons. The court decided in favor of the petitioners, and we think the decision is more than the execution of the decree of February 3, 1896. It is a decision upon the effect of subsequent legislation by Congress enacted in the exercise of its power over Indian affairs, a power which is not questioned.

The third ground urged for the dismissal of the appeal is also without merit. The contention is that the decree of the court became final the instant it was entered, February 20, 1911, and that an appeal was not taken from it until June 17, 1911, which was not within the time allowed by § 1069 of the Revised Statutes. There were, however, intervening proceedings. The record shows that "on March 30, 1911, the defendants [appellants] filed an application for appeal. On May 15, 1911, the defendants

filed a motion to withdraw the application for appeal filed March 30, 1911, which was allowed by the court May 15, 1911." On May 15, 1911, the defendants filed a motion for new trial, which motion was overruled June 5, 1911, "with privilege to the defendants to renew their application for appeal heretofore filed." The record further shows that the defendants, "from the decree rendered on the twentieth day of February, 1911, in favor of claimants, . . . make application for, and give notice of, an appeal to the Supreme Court of the United States." The application was allowed as prayed.

This court has decided that if a motion for new trial or petition for rehearing is made in season and entertained by the court, the time for taking an appeal or writ of error does not begin to run until the motion or petition is disposed of. *Kingman* v. *Western Manufacturing Co.*, 170 U. S. 675. It is, however, urged that the court lost jurisdiction of the case by the application for appeal filed March 30, 1911. *United States* v. *Adams*, 6 Wall. 101, is cited to support this contention. In that case the paper filed was as follows: "The United States, by E. P. Norton, its solicitor, makes application to the Honorable Court of Claims for an appeal of the case of *Theodore Adams* v. *The United States* to the Supreme Court of the United States." This application was filed within the ninety days allowed by the statute. The order allowing it, however, was not made until after the expiration of the ninety days. It was contended that both application and allowance should have been made within that time, but this court held otherwise, saying (p. 109) "that the filing of this paper was taking the appeal, and that the delay in the subsequent proceeding to render it effectual does not touch its validity."

It was not, however, decided that the Court of Claims lost control of the case. It was only decided that the party had secured a right under the statute. The rules of the

Court of Claims, made under regulations prescribed by this court, provided for further action to perfect the right acquired by the party which was made necessary by certain statutes under which only questions of law could be brought here for review. And the action was more than formal. It consisted in the finding of the ultimate facts in the nature of a special verdict and the questions of law therefrom to be certified to this court.

The practice in the Court of Claims is adverse to appellees' contention. The court followed the practice in entering the decree of February 3, 1896, the decree upon which appellees based all of their rights. It was substituted for a decree passed May 8, 1895. On the twentieth of July, following entry of the latter decree, the defendants filed a motion for rehearing and an application for appeal from the decree. A few days afterward the claimants also filed an application for an appeal. Later the defendants filed a motion for new trial. On January 30, 1896, the applications for appeal were withdrawn by leave of the court, and, on February 3, the decree of May 6, 1895, was vacated and the decree of the former date was entered.

It will be observed, therefore, that if the contention of appellees is correct that the Court of Claims lost jurisdiction of the decree under review by the application of appellants for an appeal March 30, 1911, the court lost jurisdiction of the case by the applications for appeal from the decree of May 8, 1895, and therefore had no jurisdiction to enter the decree of February 3, 1896, which is the foundation of the rights of appellees. Counsel would hardly like us to push their contention that far, and that far it might have to be pushed if it were tenable. The motion to dismiss is denied.

The Court of Claims obtained its jurisdiction of the questions involved by an act of Congress approved October 1, 1890, 26 Stat. 636, c. 1249, entitled "An Act to

refer to the Court of Claims certain claims of the Shawnee and Delaware Indians and the freedmen of the Cherokee Nation, and for other purposes." The rights referred to the Court of Claims for adjudication were those "in law or in equity . . . of the Cherokee freedmen" who were "settled and located in the Cherokee Nation under the provisions and stipulations of article nine" of the treaty of 1866 "in respect to the subject matter" in the act provided for. The subject-matter was described to be "to recover from the Cherokee Nation all moneys due either in law or equity and unpaid to the . . . freedmen, which the Cherokee Nation" had "before paid out, or" might thereafter "pay per capita, in the Cherokee Nation, and which was or may be" refused or neglected "to be paid to the said . . . freedmen by the Cherokee Nation, out of any money or funds" which had been, or might be, "paid into the treasury of," or in any way had come or might come "into the possession of the Cherokee Nation, Indian Territory, derived from the sale, leasing, or rent for grazing purposes on Cherokee lands west of ninety-six degrees west longitude," and which had been or might be, "appropriated and directed to be paid out per capita by the acts passed by the Cherokee council, and for all moneys, lands and rights which" should "appear to be due to the said . . . freedmen under the provisions of the aforesaid articles of the treaty and articles of agreement." 26 Stat. 636.

Article IX of the treaty of August 11, 1866, 14 Stat. 799, 801, the meaning of which was to be determined, provided as follows: "They [Cherokee Nation] further agree that all freedmen who have been liberated by the voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees."

Under the jurisdictional act, and in accordance with its provisions, suit was brought by the freedmen by their trustee, Moses Whitmire, against the Cherokee Nation and the United States to determine the rights of the freedmen under the treaty, which resulted in a decree of the court passed May 8, 1895. The course of the litigation will be found in 30 Ct. Cls. Reps. 138, 180, respectively.

The court decided that under the Cherokee constitution of 1866 the freedmen became citizens of the nation equally with the Cherokees and equally interested in the common property and equally entitled to share in its proceeds, but also decided that the freedmen to whom the treaty referred were those who had returned to the nation within six months after the promulgation of the treaty, and their descendants, and that the freedmen and the descendants of freedmen who did not return within six months were excluded from the benefits of the treaty. *United States ex rel. Lowe* v. *Fisher, ante,* p. 95.

The court decreed that the Cherokee Nation and the United States be prohibited from making any discrimination between such freedmen citizens and their descendants and native Cherokees in the distribution of a fund of $8,595,736 paid by the United States to the Cherokee Nation for that portion of its territory known as the "Cherokee Outlet."

The court conceived it necessary to ascertain the individual Indians who were entitled under its decree to share in the fund, and adjudged that the roll called the "Wallace Roll," which showed 3,524 persons, should be approved by the court.

Appeals were prayed by claimant and defendant, but were withdrawn afterward by stipulation, and a decree was entered February 3, 1896, as of May 8, 1895. The decree adjudged the rights of freedmen to be as we have hereinabove set out.

The decree also authorized the Secretary of the Interior

to appoint commissioners to make up a roll of the freedmen entitled to share in the fund to be distributed, which that officer did. They completed the roll which was thereafter known, and to which we have referred, as the Kern-Clifton roll. It was approved by the Secretary on the eighteenth of January, 1897, and in the succeeding month the moneys available for distribution were paid to the persons whose names were on the roll.

The legislation in regard to the allotment of lands and the making of rolls of persons entitled to allotments is detailed in *United States ex rel. Lowe* v. *Fisher,* and need not be repeated except in a very brief way. By virtue of that legislation the Dawes Commission, which had been created before the decree of February 3, 1896, proceeded to make up rolls, which were finally approved by the Secretary on March 4, 1907, from which were excluded a large number of freedmen whose names were on the Kern-Clifton roll, with the consequence that such persons so excluded will receive no allotments of lands or share in the moneys which stand to the credit of the Cherokee Nation in the Treasury of the United States.

On May 6, 1908, Jacob B. Wilson, by permission of the Court of Claims, and having been substituted trustee of the freedmen, filed a supplemental petition in the court in behalf of such excluded persons, which recited the decrees of the court and acts of Congress subsequent to them, asserted a right under the decrees and acts of Congress to be upon the rolls, to be allotted lands and to share in the distribution of funds, and prayed that the action of the Dawes Commission and of the Secretary of the Interior be declared unlawful, and that the Cherokee Nation and the United States be enjoined from discriminating between such freedmen and other citizens of the Cherokee Nation in the allotment of lands and the distribution of property and assets of the nation, and that it and the United States be further enjoined from further

disturbing such freedmen in the possession and occupation of their homes and improvements, and to reinstate such of them as have been ousted from such possession.

The court took jurisdiction of the petition, as we have seen, and decreed as it prayed. 44 Ct. Cls. 453. The court, in an elaborate and ably reasoned opinion, decided that its decree had larger scope than a description of the class of freedmen and the declaration of a principle, and that it undertook to identify "the individuals who were entitled to share in everything that was to be allotted or distributed." To this, the court said, the "defendants made no objections and acquiesced in the terms of the decree for the distribution of that part of the property then ready to be distributed." The court further said that "there was nothing in the terms of the decree or in the conduct of the parties affected by it to raise the inference that its language did not apply to all future distributions of the property, which the plaintiffs in that suit were entitled to have and enjoy whenever such property was ready for distribution."

The court, therefore, considered that the Kern-Clifton roll was made in compliance with the decree, and that the provisions of the Curtis Act, June 28, 1898, 30 Stat. 495, c. 517, requiring a roll to be made in "strict compliance with the decree of the Court of Claims rendered the third of February, eighteen hundred and ninety-six," necessarily confirmed the Kern-Clifton roll, and that the Dawes Commission, in disregarding it, disobeyed the command of the statute. "If," said the court, "the payment by the Secretary of the Interior was a 'compliance' with the provision of the decree for the payment of money, the refusal of the Dawes Commission to allow those same persons to participate in the common property, as further provided in the decree, is not a 'strict' compliance, nor, for that matter, a compliance of any kind."

The case is simplified by the concession of appellees that

the Congress had power to alter the decree and to adopt other means or ways for the disposition of the property than there provided. Indeed, the decree of the court recognizes this power and the case is brought to an interpretation of the acts of Congress subsequent to the decree. As we have already said, we have reviewed those acts in *United States ex rel. Lowe* v. *Fisher*, and, after a further consideration of them invoked in the case at bar and supported by the very able opinion of the Court of Claims, we adhere to the views there expressed. Congress accepted the decree as a correct interpretation of Art. IX of the treaty as to the rights of freedmen. It did not accept the Kern-Clifton roll as an authentic identification of the individual freedmen. It had been challenged. It had been made up with haste and under circumstances which caused question of its correctness. It had not received judicial approval. From the first to the last it was the act of administrative officers. Had it been reported to the court and its integrity established by the judgment of the court, Congress might, indeed, have hesitated to ignore it. As an act of merely administrative officers it had no such sanction. It must be borne in mind that important rights were involved and no good reason could be urged against, or serious consequences apprehended from another investigation. Those who were entitled to be enrolled could again establish their right. Those who were not so entitled and who had got on the rolls either by mistake or fraud had no legal ground of complaint. However, we are not required to consider the reasons which induced Congress to direct that a roll be made by the Dawes Commission. Congress had the power, and, as we have decided, exercised it.

*Decree reversed and case remanded with directions to dismiss the supplemental petition.*