**CHIPPEWA CREE TRIBE OF the ROCKY BOY'S RESERVATION, et al., Plaintiffs,**

**and**

**Melinda Gopher and Mary Gopher, Proposed Intervenors,**

**v.**

**The UNITED STATES, Defendant.**

**No. 02–6751 L.**

United States Court of Federal Claims.

Feb. 10, 2009.

Melinda Gopher and Mary Gopher, Missoula, MT, pro se.

Melody L. McCoy, Boulder, CO, for plaintiffs. Dawn Sturdevant Baum, Washington, DC, of counsel.

Carol L. Draper, Environment and Natural Resource Division, United States Department of Justice, Washington, DC, for defendant. Elizabeth Nicholas, United States Department of Justice, of counsel. Elisabeth C. Brandon and Joshua Edelstein,

United States Department of the Interior, Office of the Solicitor, Washington, DC, of counsel.

### OPINION

HEWITT, Judge.

Before the court are a Motion to Intervene filed on April 29, 2008 (Motion or Mot.) by two individuals, Melinda and Mary Gopher (Proposed Intervenors), Proposed Intervenors' Complaint Alleging Right to Intervene in Re: *Chippewa Cree Tribe of the Rocky Boy Reservation v. U.S.* 92–675 L (Complaint or Compl.), filed July 3, 2008, and Proposed Intervenors' Memorandum in Support of Complaint (Memorandum or Memo.), filed July 3, 2008. The responsive briefing consists of Plaintiffs' Response in Opposition to Gophers' Motion to Intervene (plaintiffs' Response or Pls.' Resp.), filed September 30, 2008, and Defendant's Brief in Opposition to Proposed Intervenors' Mary and Melinda Gopher's Motion to Intervene (defendant's Response or Def.'s Resp.), filed September 30, 2008. Proposed Intervenors filed their Response to Defendant['s] Answer (Reply) on October 30, 2008.

### I. Background [1]

#### A. Factual Background

The funds at issue in this case were awarded in two suits brought by descendants of the Red Lake Band of Chippewa Indians and the Pembina Band of Chippewa Indians challenging the compensation received for lands located along the Red River in what are now the states of North Dakota and Minnesota. *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States (Chippewa)*, 69 Fed.Cl. 639, 644 (2006). The lands were ceded to the United States in two separate agreements. *See Red Lake, Pembina and White Earth Bands v. United States (Red Lake, Pembina and White Earth Bands)*, 164 Ct.Cl. 389, 392–93, 1964 WL 8580 (1964); *Turtle Mountain Band of Chippewa Indians*

*v. United States (Turtle Mountain Band)*, 203 Ct.Cl.426, 490 F.2d 935, 938 (1974).

The first suit sought compensation for 7,488,280 acres, *see Red Lake, Pembina and White Earth Bands*, 164 Ct.Cl. at 394, ceded to the United States under the Treaty Between the United States and the Red Lake and Pembina Bands of Chippewa Indians, May 5, 1864, 13 Stat. 667, (concluded Oct. 2, 1863) (amended Apr. 12, 1864) (the 1863 Treaty). The United States paid eight cents an acre for this land. *See Red Lake, Pembina and White Earth Bands*, 164 Ct.Cl. at 394. The Indian Claims Commission found the payment to be unconscionable and granted a gross award of $3,369,726.00 to the plaintiff tribes, with a net value of $2,760,245.64 (the 1964 Award) after taking into account previous payments on the award. *Id.* One-third of the gross settlement was adjudged for the Pembina Band. *Id.* at 399. The Court of Claims also addressed the distribution of the 1964 Award and determined that "the award must go to the tribal entities rather than descendants of the bands." *Id.* (citations omitted).

Congress appropriated funds to satisfy the 1964 Award and a number of other settlements and judgments in the Deficiency Appropriation Act of 1964, Pub.L. No. 88–317, 78 Stat. 204 (1964). In 1971, Congress approved a plan for the distribution of the 1964 Award. Pub.L. No. 92–59, 85 Stat. 158 (1971) (codified at 25 U.S.C. §§ 1241–1248 (2006)) (1971 Distribution Act). The 1971 Distribution Act apportioned the 1964 Award among four beneficiaries: (1) the Minnesota Chippewa Tribe (White Earth Band), (2) the Turtle Mountain Band of Chippewas of North Dakota, (3) the Chippewa Cree Tribe of Montana, and (4) the group of lineal descendants of the Pembina bands which were parties to the 1863 Treaty but who were not eligible for membership in any of the three named beneficiary tribes (the non-member Pembina descendants). *See* 25 U.S.C. § 1244. The Secretary of the Interior was instructed to establish a roll of eligible Pembina descendants, 25 U.S.C. § 1242, and to

---

1. The facts presented are only those relevant to the court's decision on the Motion to Intervene (Motion or Mot.), filed April 29, 2008, by the two individuals presently before the court (Proposed

Intervenors). For additional background information, see *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States (Chippewa)*, 69 Fed.Cl. 639 (2006).

apportion funds among the three named tribes according to their enrolled membership, with the remaining funds distributed in equal shares among the non-member Pembina descendants, 25 U.S.C. § 1244. The three named tribal beneficiaries also requested that their portions of the 1964 Award be distributed to eligible members on a per capita basis. *Chippewa*, 69 Fed.Cl. at 645. Distribution of the 1964 Award began in October 1984, twenty years after appropriation of the judgment funds. *Id.*

The second suit sought just compensation for about 10 million acres of land in North Dakota that were not ceded under the 1863 Treaty but from which many of the Pembina Chippewa were subsequently compelled to move on threat of loss of their annuities negotiated under the 1863 Treaty. *See Turtle Mountain Band*, 490 F.2d at 938. The McCumber Commission[2] negotiated an agreement with the Chippewas in October 1892 (1892 Agreement), amended and approved by Congress in 1904, which ceded the 10 million acres in question to the United States. *Chippewa*, 69 Fed.Cl. at 645 (citing Lieu Lands Act of 1904, ch. 1402, 33 Stat. 189, 194). The Chippewas were paid $1 million for the 10 million acres of land, 33 Stat. at 195, leading many to refer to the 1892 Agreement as the "Ten Cent Treaty." *Id.* (citation omitted). In a suit brought by the Turtle Mountain Band of Chippewa Indians, the Red Lake and Pembina Bands, and the Little Shell Band of Chippewa Indians, the Indian Claims Commission awarded the plaintiffs $52,527,337.97 as additional compensation for land ceded by the 1892 Agreement. *Chippewa*, 69 Fed.Cl. at 645 (citing *United States v. Turtle Mountain Band of Chippewa Indians*, 222 Ct.Cl. 1, 612 F.2d 517, 518–19 (1979) (noting that the award represents "the difference between the fair market value of the land on the date of extinguishment of the aboriginal title and the compensation the government previously paid for the land")). The net award of $47,376,622.93, reflecting offsets and adjustments of $5,150,715.04, was decided in a par-

tial judgment of March 18, 1980 (the 1980 Award). *Turtle Mountain Band of Chippewa Indians v. United States*, 229 Ct.Cl. 872, 872 (1980). The 1980 Award was subsequently adjusted by $250,000 in a December 1, 1981 judgment. *Id.* The 1964 Award and the 1980 Award together comprise what the parties refer to as the Pembina Judgment Fund (PJF).

Congress provided for the use and distribution of the 1980 Award in December 1982. *See* Pub.L. No. 97–403, 96 Stat.2022 (1982) (1982 Distribution Act). Section 2 of the 1982 Distribution Act divided the appropriated funds and the accrued interest and investment income among the Turtle Mountain Band of Chippewa Indians, the Chippewa Cree Tribe of Rocky Boy's Reservation, the Minnesota Chippewa Tribe, the Little Shell Band of the Chippewa Indians of Montana, and the non-member lineal Pembina descendants. *Id.* §§ 2, 7(a)(5)(A). For the four tribes or bands, the funds were to be divided into two portions: 80% of the funds were to be distributed in the form of per capita payments among the eligible members of the tribe or band living at the time of the enactment of the 1982 Distribution Act, with the remaining 20% of funds held in trust and invested for the benefit of the members of the tribe or band by the Secretary of the Interior. *Id.* §§ 3–6. The interest and investment income on the 20% portion could be used by the governing body of the tribe or band on the basis of an annual program budget, subject to the approval of the Secretary of the Interior. *Id.* The non-member lineal Pembina descendants were to receive their distributions on a per capita basis. *Id.* §§ 2, 7(c). "A partial distribution of the per capita funds was initiated in May 1988 and the final per capita distribution was carried out in 1994." *Chippewa*, 69 Fed.Cl. at 645–46.

### B. Identity of the Movants

Proposed Intervenors identify themselves as "the Red Lake/Pembina [d]escendants of

---

**2.** Congress established the McCumber Commission to acquire the land in North Dakota following two unsuccessful attempts to negotiate a land cession with the Pembina Band. *Turtle Mountain*

*Band of Chippewa Indians v. United States (Turtle Mountain Band)*, 203 Ct.Cl.426, 490 F.2d 935, 938 (1974).

the Rocky Boy's Band of Chippewa Indians." Compl. 2.

Proposed Intervenors state that they are descendants of "Mask-co-cash-e-qua (Bear Claw Woman)," Memo. 4, whose "English name was Mary Chippewa," id., and who later became Mary Chippewa Gopher after marrying Jim Loud Thunder Gopher, id. The court understands Proposed Intervenors' contention to be that their ancestor, Mary Chippewa Gopher, was listed on a "1908–09 roll [ (1909 Roll) ] that was authorized by the Indian Commissioner and conducted by [Department of the] Interior Agent, Thralls B. Wheat, who conducted the Wheat census of the Rocky Boy['s] Band of Chippewa [Indians of Montana] .... in November 1908." Id. at 5–6.[3] Proposed Intervenors contend that the 1909 Roll established membership of the Rocky Boy's Band of Chippewa Indians of Montana. Id. at 4–6. Proposed Intervenors argue that because Mary Chippewa Gopher and other of Proposed Intervenors' ancestors appeared on the 1909 Roll, Proposed Intervenors are entitled to be beneficiaries of the PJF and, accordingly, are entitled to receive payments under both the 1971 Distribution Act and 1982 Distribution Act. See id. (discussing defendant's alleged failure to rely on the 1909 Roll in order properly to execute the 1971 Distribution Act and 1982 Distribution, and "aver[ring] violations of rights consistent with the two Distribution Acts").

The 1971 Distribution Act, in relevant part, vests the Secretary of the Interior with the power to determine the "lineal descendants of the Pembina Band" and provides that:

The Secretary of the Interior shall prepare a roll of all persons born on or prior to and living on July 29, 1971, who are lineal descendants of members of the Pembina band as it was constituted in 1863[.]

25 U.S.C. § 1242. The 1971 Distribution Act further states:

The determination of the Secretary of the Interior regarding the utilization of available rolls and records and the eligibility for enrollment of an applicant shall be final.

Id. § 1243.

The 1971 Distribution Act also vests the Secretary of the Interior with the power to determine which of the enrolled Pembina descendants were members of the named beneficiary tribes:

In developing the roll of Pembina descendants, the Secretary of the Interior shall determine which enrollees are members of the Minnesota Chippewa Tribe, the Turtle Mountain Band of Chippewas of North Dakota, or the Chippewa–Cree Tribe of Montana[.]

Id. § 1244.

In addition to providing for the distribution of PJF funds among the eligible members of the beneficiary tribes named in the statute, section 7 of the 1982 Distribution Act provides for the enrollment and distribution of PJF funds to non-member lineal Pembina descendants:

(a) In order to establish eligibility to participate in the distribution of the funds allocated to the nonmember Pembina Chippewa descendants ... the Secretary [of the Interior] shall develop a roll of all individuals who

. . . .

(4) are not members of [the named beneficiary tribes], and

(5) are—

(A) enrolled, or the descendants of a lineal ancestor enrolled—

. . . .

(iv) as Chippewa on—

---

3. The court infers the contention that Mary Chippewa Gopher was listed on a "1908–09 roll [ (1909 Roll) ] that was authorized by the Indian Commissioner and conducted by [Department of the] Interior Agent, Thralls B. Wheat, who conducted the Wheat census of the Rocky Boy['s] Band of Chippewa [Indians of Montana] .... in November 1908," Proposed Intervenors' Memorandum in Support of Complaint (Memorandum or Memo.) 5–6, from Proposed Intervenors' stat-

ed contention that Mary Chippewa Gopher was "de-listed along with 90 other members of the original band [from] the tentative roll of the Rocky Boy Reservation of May 30, 1917 [ (1917 Roll) used by defendant to determine Chippewa ancestry]." Memo. 4 (emphasis added). The 1909 Roll is not in evidence. Whether or not Mary Chippewa Gopher was in fact on the 1909 Roll does not affect the court's disposition of Proposed Intervenors' Motion.

(I) the tentative roll of the Rocky Boy Indians of May 30, 1917, or

(II) the McLaughlin census report of the Rocky Boy Indians of July 7, 1917, or

(III) the Roe Cloud Roll of Landless Indians of Montana, or

(B) able to establish Pembina ancestry on the basis of any other rolls or records acceptable to the Secretary [of the Interior].

(b) The Secretary [of the Interior] shall promulgate regulations regarding non-member Pembina enrollment procedures and shall utilize any documents acceptable to the Secretary in establishing eligibility of an individual to receive funds under this section.

1982 Distribution Act, § 7.

Proposed Intervenors contest defendant's reliance on "the tentative roll of the Rocky Boy Reservation of May 30, 1917 [ (1917 Roll) ]," Memo. 4, prescribed under section 7 of the 1982 Distribution Act, and characterize the 1917 Roll as flawed because it excluded Proposed Intervenors' ancestors whose names appeared on the 1909 Roll. *See id.* ("[Mary Chippewa Gopher was] de-listed along with 90 other members of the original band [from the 1917 Roll used by defendant to determine Chippewa ancestry]."); *see also* Memo. 8 (referring to the 1917 Roll as "flawed"). Proposed Intervenors argue in support of their intervention in this case based on their identity as descendants of the Rocky Boy's Band of Chippewa Indians despite the fact that they are neither (1) enrolled members of any of the beneficiary tribes named in the 1971 Distribution Act or the 1982 Distribution Act; nor (2) recognized as non-member lineal Pembina descendants entitled to a portion of PJF funds under the 1982 Distribution Act, as determined by the Secretary of the Interior.

## II. Legal Standards

■ Intervention is governed by Rule 24 of the Rules of the Court of Federal Claims (RCFC). Intervention may be allowed either as a matter of right under RCFC 24(a) or permissively under RCFC 24(b). RCFC 24(a),(b). "Although the requirements for intervention are to be construed in favor of

intervention," *Am. Mar. Transp., Inc. v. United States (American Maritime),* 870 F.2d 1559, 1561 (Fed.Cir.1989), courts routinely deny motions to intervene, *see, e.g., id.* at 1563 (affirming denial of motion to intervene because applicant "ha[d] not claimed an interest recognized under Rule 24(a)").

■ The rule governing intervention of right states:

> On timely motion, the court must permit anyone to intervene who ... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

RCFC 24(a)(2). While it is true that "[i]f the movant satisfies the elements of RCFC 24(a), the court is without discretion, and the movant 'shall be permitted to intervene,'" *Fifth Third Bank v. United States,* 52 Fed.Cl. 202, 203 (2002) (quoting RCFC 24(a)), courts are nevertheless "entitled to the full range of reasonable discretion in determining whether the[ ] requirements [for intervention of right] have been met," *Rios v. Enter. Ass'n Steamfitters Local Union No. 638 of U.A.,* 520 F.2d 352, 355 (2d Cir.1975); *see also* 6 James Wm. Moore, *Moore's Federal Practice* § 24.03[5][a], at 24–53 (3d ed. 2004) ("Despite the label 'intervention of right,' courts exercise some discretion in weighing a motion to intervene under Rule 24(a)(2).").

The rule governing permissive intervention states:

> On timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact.... In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

RCFC 24(b). The rule specifically vests the court with discretion in deciding whether to allow permissive intervention. *See* RCFC 24(b). Trial courts possess "broad discretion in determining whether to grant permissive intervention." 6 James Wm. Moore, *Moore's*

*Federal Practice* § 24.10[1], at 24–57 (3d ed.2004) (citing, *inter alia, Rosenshein v. Kleban,* 918 F.Supp. 98, 106 (S.D.N.Y.1996)).

### III. Discussion

■ For the reasons discussed below, Proposed Intervenors do not meet the requirements either for intervention of right pursuant to RCFC 24(a), or for permissive intervention pursuant to RCFC 24(b).

### A. Intervention of Right

■ To succeed on a motion to intervene of right under RCFC 24(a), applicants "must show that: (1) they have an interest relating to the property or transaction that is the subject of the action; (2) without intervention the disposition of the action may, as a practical matter, impair or impede the applicants' ability to protect that interest; and (3) their interest is inadequately represented by the existing parties." *Freeman v. United States (Freeman),* 50 Fed.Cl. 305, 308–09 (2001). In addition, the application to intervene must be "timely." RCFC 24(a). An applicant must demonstrate the existence of each factor. *Freeman,* 50 Fed.Cl. at 308 (stating that intervention of right must be granted "[i]f the applicants satisfy each element" of the applicable provision of Rule 24(a)). If an applicant fails to demonstrate any one of these factors, the application to intervene of right is denied. *See id.* at 309. Because Proposed Intervenors have failed to meet the requirements of RCFC 24(a), their claim is insufficient to support intervention of right. *See id.*

#### 1. Proposed Intervenors' Interest

RCFC 24(a) requires that an applicant for intervention of right establish "an interest relating to the property or transaction that is the subject of the action." *Id.* at 308. "[T]here is no authoritative definition of precisely what kinds of interest satisfy the requirements of the rule." 6 James Wm. Moore, *Moore's Federal Practice* § 24.03[2][a] 24–28 (3d ed.2004). Therefore, the court applies the principles set forth by the Federal Circuit, and those principles set forth in the cases upon which the Federal

Circuit has relied, to the factual circumstances of this case.

■■ In order to intervene of right, the interest of applicants in the property or transaction must be " ' "of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment." ' " *American Maritime,* 870 F.2d at 1561 (citations omitted) (emphases in original). "The interest thus may not be either indirect or contingent." *Id.* (citations omitted). "The interest must also be a 'legally protect[a]ble interest.' " *Id.* (citation omitted). A legally protectable interest is " 'one which the *substantive* law recognizes as belonging to or being owned by the applicant.' " *Id.* at 1562 (citation omitted) (emphasis in original).

The court now examines whether Proposed Intervenors' interest is direct and immediate, and whether it is a legally protectable interest as required by RCFC 24(a).

Proposed Intervenors claim that they have an interest in ensuring the "proper[ ] determin[ation]" of individuals who are beneficiaries of the PJF. Reply 4. However, Proposed Intervenors' expressed interest in this case is analogous to the interest examined in prior cases in which the applicant's interest was found to be indirect or contingent. In *American Maritime,* the applicant's interest was in preventing increased competition that could occur as a result of the court's decision. *American Maritime,* 870 F.2d at 1561–62. The court observed that the specter of increased competition would only result if "every one of a chain of other possible, but not certain, events were to take place." *Id.* at 1561. In that case, there was "no consequence to [potential intervenor] flow[ing] immediately from a Claims Court ruling." *Id.;* cf. also *Karuk Tribe of Ca. v. United States (Karuk Tribe),* 27 Fed.Cl. 429, 431 (1993) (addressing motion to intervene brought by individuals whose interest was based on a fear that Congress would amend the settlement act at issue in the litigation if liability was found, and describing the interest as "indirect and contingent on other events"), 432 (denying motion to intervene).

Proposed Intervenors in this case fear that, absent court intervention, they will nev-

er gain recognition as beneficiaries of the PJF. *See* Reply 18 ("[I]f the Motion is not granted[,] ... [Proposed Intervenors'] identity as Chippewa will be gravely, fatally and irreversibly eroded."). However, here, as in *Karuk Tribe*, "[t]he direct result of a judgment in favor of the plaintiff in this case would only be a monetary award from the government to the plaintiff." *Karuk Tribe*, 27 Fed.Cl. at 431–32 (finding that applicant-intervenors did not have a direct interest in the action and denying intervention of right); *see also Hage v. United States (Hage)*, 35 Fed.Cl. 737, 740–41 (1996) (denying intervention of right based on the similarity between the potential "awards [of] a large judgment to plaintiffs" in *Hage* to the circumstances in *Karuk Tribe* and stating that in *Hage*, as in *Karuk Tribe*, applicant-intervenor's interest was indirect because "[t]he only direct result of a victory by plaintiffs would be a monetary award paid by the federal government."). Decisions as to liability and damages awards made in this case have no immediate consequence for Proposed Intervenors because they are not recognized as beneficiaries of the PJF. *See* Reply 1–2 (discussing Proposed Intervenors' ineligibility to receive PJF funds); Def.'s Resp. 10. Therefore here, as in both *Karuk Tribe* and *Hage*, Proposed Intervenors' interest is not direct.

This case is readily distinguishable from *Osage Tribe of Indians of Okla. v. United States (Osage)*, in which applicant-intervenors were individual headright holders who were, pursuant to statute, entitled to a pro-rata share of any damages awarded to the plaintiff-tribe in that case. *Osage*, 85 Fed.Cl. 162, 168–69 (2008). Accordingly, any recovery by applicant-intervenors in that case was found to be "necessarily and directly dependent upon the ultimate amount of the judgment, if any, awarded in th[at] litigation." *Id.* Here, however, Proposed Intervenors themselves state that they were "denied tribal enrollment," Reply 1, and therefore are not currently considered to be beneficiaries of the PJF, *see id.* at 1–2 (discussing Proposed Intervenors' ineligibility to receive PJF funds). Proposed Intervenors lack entitlement to be beneficiaries of the PJF. *Id.* Therefore, the result that Proposed Intervenors fear—namely, that they will not become

beneficiaries of the PJF—simply cannot occur as a consequence of this court's rulings. Proposed Intervenors' interest is therefore not " ' "of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment." ' " *American Maritime*, 870 F.2d at 1561 (citations omitted) (emphases in original).

In addition to having a direct and immediate interest in the subject of the action, an applicant must have an interest that is "legally protectable" in order to support intervention of right. *Id.* In order to be legally protectable, the applicant must demonstrate "more than merely an economic interest." *Id.* at 1562. In *American Maritime*, the Federal Circuit relied upon *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co. (New Orleans)* to define a legally protectable interest as " 'one which the substantive law recognizes as belonging to or being owned by the applicant.' " *Id.* at 1562 (quoting *New Orleans*, 732 F.2d 452, 464 (5th Cir.1984) (emphasis omitted)).

The facts of this case are analogous to cases in which courts have clearly stated that it is outside the scope of their authority to entertain disputes brought by individuals contesting Congressional determinations as to tribal membership. Proposed Intervenors are "asking the [c]ourt to determine proper PJF beneficiaries ... [and] restore the class of PJF beneficiaries to those with Chippewa ancestry only." Reply 8; *see also id.* at 5 ("[T]he applicants are asking the [c]ourt to clarify and affirm successorship of the Rocky Boy's Band of Chippewa Indians...").

In *Cherokee Freedmen v. United States (Cherokee Freedmen)*, the plaintiffs, Cherokee Freedmen, alleged that they were improperly refused enrollment in the Cherokee Nation and consequently suffered injury by not receiving allotments of Cherokee land then being divided. *Cherokee Freedmen*, 161 Ct.Cl. 787, 789, 1963 WL 8556 (1963). The Cherokee Freedmen were a group of former slaves of the Cherokees as well as "free colored persons" present in lands claimed by the Cherokee Nation at the time of the Civil War and who resided there following the

war. *See Cherokee Freedmen v. United States (Cherokee Freedmen II)*, 195 Ct.Cl. 39, 41, 1971 WL 17825 (1971). The Freedmen "were taken and deemed to be citizens of the Cherokee Nation by the Nation's constitution." *Id.* (internal quotations omitted). The plaintiffs represented a group of such Freedmen—"those who (or whose ancestors) were listed on two rolls of Cherokee Indians prepared before 1900 (the Wallace [roll] and [the] Kern–Clifton roll) but who were not included in the roll drawn up in the first decade of [the twentieth] century by the Dawes Commission under legislation authorizing and directing that tribunal to hear and determine applications for enrollment in the [Cherokee] Nation. *Id.* In regard to the roll of eligible Cherokee Freedmen drawn up by the Dawes Commission at the direction of Congress, the Supreme Court noted, "[W]e are not required to consider the reasons which induced Congress to direct that a roll be made.... Congress had the power, and, as we have decided, exercised it." *Cherokee Nation v. Whitmire (Whitmire)*, 223 U.S. 108, 117, 32 S.Ct. 200, 56 L.Ed. 370 (1912); *see also Cherokee Freedmen II*, 195 Ct.Cl. at 48 (noting that "Congress (or its agent) is to settle disputes as to the composition of, or membership in, the group entitled to the money" from a judgment awarded by the court). In this case, Congress, through the 1971 Distribution Act and the 1982 Distribution Act, determined who should receive the amounts awarded by the 1964 Award and the 1980 Award to the Pembina Band of Chippewa Indians. *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States (Chippewa II)*, 73 Fed.Cl. 154, 165–66 (2006). Accordingly, "any damages awarded will respect the determination by Congress of the persons entitled thereto." *Id.* at 166. Neither Proposed Intervenors, nor their ancestors, were included on the 1917 Roll used by defendant to determine beneficiaries of the PJF. Reply 2. Proposed Intervenors therefore do not hold an interest " 'which the substantive law recognizes as belonging to or being owned by [them],'" *see American Maritime*, 870 F.2d at 1562 (quoting *New Orleans*, 732 F.2d at 464) (emphasis omitted), and the court "declines [Proposed Intervenor's] invitation to disregard Congress' de-

termination in a matter in which Congress' power is plenary," *Chippewa II*, 73 Fed Cl. at 166 n. 5 (citing *Whitmire*, 223 U.S. at 117, 32 S.Ct. 200).

For the foregoing reasons, Proposed Intervenors do not have a direct and immediate legally protectable interest in the subject of the action and therefore do not meet the interest requirement of RCFC 24(a). The finding that Proposed Intervenors do not meet the interest requirement of RCFC 24(a) is a complete bar to granting intervention of right. *See Freeman*, 50 Fed.Cl. at 309. However, for completeness, the court examines the other factors in the intervention of right analysis.

### 2. Proposed Intervenors' Ability to Protect Their Interest

 Proposed Intervenors must also demonstrate that "without intervention the disposition of the action may, as a practical matter, impair or impede the applicants' ability to protect th[eir] interest." *Freeman*, 50 Fed.Cl. at 308. Proposed Intervenors argue that if they are not allowed to intervene, their ability to protect their interest will be impaired or impeded because they will be without a remedy for "the historic fraud that has occurred" with regard to "beneficiaries [who] have been arbitrarily denied tribal enrollment." Reply 8–9. Proposed Intervenors' impairment of interest argument is unpersuasive because they fail to demonstrate an absence of relief in alternative appropriate forums.

 Proposed Intervenors state that "[t]he [1909 Roll] was improperly excluded as a basis from which to determine Pembina ancestry. As a result of this oversight, [Proposed Intervenors] are asking the [c]ourt to order the revision of the law to include language ... requiring ... ancestry in the original [1909 Roll] to verify PJF [beneficiary] status." Reply 15. At the outset, the court notes that it has already found that Proposed Intervenors' interest in gaining status as PJF beneficiaries does not qualify as a direct and immediate legally protectable interest in this litigation as required by RCFC 24(a). *See supra* Part III.A.1. Moreover, Proposed Intervenors have alternative venues to con-

test the exclusion of their ancestors from the 1917 Roll used by defendant. The availability of alternative venues is a pivotal consideration in the intervention context. *See, e.g., Cheyenne–Arapaho Tribes of Indians of Okla. v. United States (Cheyenne–Arapaho),* 1 Cl.Ct. 293, 296 n. 4 (1983). Proposed Intervenors themselves acknowledge that "the ultimate duty [to determine the identity of beneficiaries to the PJF] lies with the Secretary [of the Interior]." Reply 20. Case law makes clear that questions as to "the composition of the particular entity or group in whose favor an award is made .... [are] beyond the competence of ... this court; they are reserved for Congress or for authorized administrative resolution when the award is paid." *Cherokee Freedmen II,* 195 Ct.Cl. at 46–47 (discussing the court's deference to Congress's determination that only those individuals whose names appeared on the roll known as the Dawes roll were entitled to receive a per capita distribution of the monetary award in that case and stating that the determination of beneficiaries "is a controversy to be resolved by the legislative and executive branches, not by ... the court"). In addition, the terms of both the 1971 Distribution Act and the 1982 Distribution Act vest the Secretary of the Interior with discretion in deciding the eligibility of individuals for PJF funds. 25 U.S.C. § 1242–43; 1982 Distribution Act § 7. The 1971 Distribution Act grants to the Secretary of the Interior the authority to establish a roll of eligible Pembina descendants, 25 U.S.C. § 1242, and states that "the determination of the Secretary of the Interior regarding the utilization of available rolls and records and the eligibility for enrollment of an applicant *shall be final,*" 25 U.S.C. § 1243 (emphasis added). Similarly, the 1982 Distribution Act authorizes the use of specific rolls including the 1917 Roll and "any other rolls or records *acceptable to the Secretary,*" 1982 Distribution Act, § 7(a)(5) (emphasis added), and authorizes the use of "any documents *acceptable to the Secretary* in establishing [PJF beneficiary status] under this section," id.

§ 7(b) (emphasis added). This court cannot determine a matter committed by the Congress to the discretion of the executive branch.

Numerous courts have found intervention to be inappropriate "where relief is available elsewhere." *Cheyenne–Arapaho,* 1 Cl.Ct. at 296 n. 4; *see also id.* at 296 (finding the prejudice to the potential intervenors to be "slight, if indeed, existent" where they "made no showing that other future avenues of relief ... are totally unavailable"); *TRW Envtl. Safety Sys., Inc. v. United States,* 16 Cl.Ct. 516, 519 (1989) (stating that the potential intervenor "would not appear to be substantially prejudiced by a denial of its motion, for [the applicant] retains its right to bring a separate action"); *Ackley v. United States,* 12 Cl.Ct. 306, 309 (1987) (finding that the applicants' rights would not be prejudiced because they had filed a separate action and their pursuit of that claim would not be inhibited by denying intervention). This court can only determine whether plaintiffs are entitled to compensation. The court cannot determine issues related to the identity of proper individual beneficiaries. *See* 25 U.S.C. § 1242–43; 1982 Distribution Act § 7 (vesting the Secretary of the Interior with discretion to decide the eligibility of individuals for PJF funds); *see also infra* Part III.B (discussing the court's lack of subject matter jurisdiction over Proposed Intervenors' claims). Proposed Intervenors can protect their interest by contesting in another forum any prior congressional or tribal actions that Proposed Intervenors regard as unjust, as well as any per capita distributions which occur subsequent to the judgment in this case which Proposed Intervenors perceive to be inequitable. In this case, not only is relief "available elsewhere," *Cheyenne–Arapaho,* 1 Cl.Ct. at 296 n. 4, relief is unavailable in this court.[4] Here, as in *Cheyenne–Arapaho,* there are other venues where relief may be available. *See id.* "While the movants may face the prospect of being excluded from the distribution of judgment funds, they have made no showing that other future avenues

---

4. The unavailability of relief in this court is examined further in the court's discussion of Proposed Intervenors' application for permissive intervention pursuant to Rule 24(b) of the Rules of

the Court of Federal Claims (RCFC), and the court's lack of subject matter jurisdiction over Proposed Intervenors' claims. *See infra* Part III.B.

of relief, either in Congress, or against the Tribe or others are totally unavailable." *Id.* at 296. For these reasons, denying intervention in this case does not operate to preclude Proposed Intervenors from seeking relief elsewhere, such as in Congress, in order to protect their interests in gaining recognition as beneficiaries to the PJF.

For the foregoing reasons, Proposed Intervenors have not demonstrated that "without intervention the disposition of the action may, as a practical matter, impair or impede the applicants' ability to protect th[eir] interest." *Freeman,* 50 Fed.Cl. at 308.

### 3. Adequacy of Representation by Existing Parties

■■■ In order to be granted intervention of right, applicants must demonstrate that "their interest is inadequately represented by the existing parties." *Id.* at 308–09.

■■■ Proposed Intervenors contend that plaintiff, Chippewa Cree Tribe of the Rocky Boy's Reservation, does not adequately represent their interests because "the 'Chippewa Cree' entity [is] acting with willful intent, harm and scienter to damage and fatally erode Chippewa sovereignty." Reply 16. The court understands the claimed factual predicate for Proposed Intervenors' allegations to be the recognition accorded the Chippewa Cree Tribe of the Rocky Boy's Reservation as a tribe by the United States. However, Proposed Intervenors do not provide, and the court is unaware of, any support for the contention that these allegations establish inadequate representation in this suit—which is limited to plaintiffs' claims for monetary damages from defendant for alleged breach of its fiduciary duties owed to plaintiffs in defendant's role as trustee. *See* Mot. *passim;* Memo. *passim;* Reply *passim.* To the extent that Proposed Intervenors' allegation that plaintiff is "erod[ing] Chippewa sovereignty" is based on their contention that plaintiff, Chippewa Cree Tribe of the Rocky Boy's Reservation, has erroneously been granted federal acknowledgment as a tribe, Reply 16, that is an issue that is outside the scope of this court's jurisdiction. *See infra* Part III.B.

Moreover, the court has already found that Proposed Intervenors' interest in gaining status as PJF beneficiaries does not qualify as a direct and immediate legally protectable interest in this litigation as required by RCFC 24(a). *See supra* Part III.A.1. Accordingly, the issue of whether or not the existing parties adequately represent Proposed Intervenors' interest is irrelevant.

### 4. Timeliness

■■■ Under both RCFC 24(a) and RCFC 24(b), the application to intervene must be "timely." RCFC 24(a), (b). The court determines timeliness from "all the circumstances" and exercises "sound discretion" in making its determination. *NAACP v. New York,* 413 U.S. 345, 366, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973); *see Te–Moak Bands of W. Shoshone Indians of Nev. v. United States,* 18 Cl.Ct. 82, 86 (1989) ("It is within the discretion of the court to decide which delays render motions untimely."); *Cheyenne–Arapaho,* 1 Cl.Ct. at 294 ("The question of timeliness is largely committed to the discretion of the trial court."). The court should examine three factors when determining whether a motion to intervene is timely:

> "(1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[s] . . .;
>
> (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention;
>
> (3) existence of unusual circumstances militating either for or against a determination that the application is timely."

*John R. Sand & Gravel Co. v. United States (J.R. Sand),* 59 Fed.Cl. 645, 649 (2004) (quoting *Belton Indus., Inc. v. United States (Belton Indus.),* 6 F.3d 756, 762 (Fed.Cir.1993)), *aff'd sub nom. John R. Sand & Gravel Co. v. Brunswick Corp. (J.R. Sand II),* 143 Fed. Appx. 317 (Fed.Cir.2005) (table) (alterations in original).

■■■ As to factor (1), because the court finds that Proposed Intervenors do not have, nor have they previously held, a legally protectable interest in this litigation, factor (1) is irrelevant. *See supra* Part III.A.1. More

specifically, because factor (1) speaks of a would-be intervenor's "right," and Proposed Intervenors do not have a right to bring the underlying claims in this litigation, Proposed Intervenors do not, *a fortiori*, satisfy factor (1).

As to factor (3), Proposed Intervenors argue that special circumstances exist in this case because of "the concealment of the 1909 Chippewa blood roll ... the only means to establish ... PJF ancestry and beneficiary status." Reply 6. Proposed Intervenors fail to provide, and the court is unaware of, any support for the contention that these facts are sufficient to establish the "existence of unusual circumstances militating for ... a determination that the application is timely." *J.R. Sand*, 59 Fed.Cl. at 649. On the contrary, the fact that a body of case law exists which addresses the precise issue of contestations of tribal enrollment practices, militates against the existence of unusual circumstances in this case. *See, e.g., Cherokee Freedmen II*, 195 Ct.Cl. at 41; *Whitmire*, 223 U.S. at 117, 32 S.Ct. 200. In addition, even if a dispute over a group of individuals' status as beneficiaries to a judgment award were a novel issue before the court, Proposed Intervenors fail to provide any support for the contention that the presentation of a novel issue in any way explains or excuses their delay in bringing their Motion, such that the Motion should be regarded as timely for purposes of intervention under either RCFC 24(a) or RCFC 24(b). *See* Mot. *passim;* Memo. *passim;* Reply *passim.*

Even if Proposed Intervenors were viewed as having satisfied factors (1) and (3), the court views intervention as prejudicial to the parties under factor (2) when the court "weigh[s] the prejudice to the parties if intervention is allowed against the prejudice to the potential intervenor[s] if intervention is not allowed." *J.R. Sand*, 59 Fed.Cl. at 651 (citing *Belton Indus.*, 6 F.3d at 762). This prong measures only the prejudice caused by a potential intervenor's delay and not that caused by the intervention itself. *Utah Ass'n of Counties v. Clinton (Utah Association)*, 255 F.3d 1246, 1251 (10th Cir.2001). Proposed Intervenors argue that their Motion should be regarded as timely because

their efforts in other fora to gain status as beneficiaries to the PJF have been denied by defendant. *See* Reply 10 (stating that "[d]efendant ... has been approached multiple times throughout history by [Proposed Intervenors]" and arguing that "[d]efendant[']s own negligence is often the root of the delay"). However, apart from conclusory statements, Proposed Intervenors fail to provide any reason why their efforts in other fora precluded a simultaneous application for intervention in this case, nor do Proposed Intervenors provide any support for the contention that another party's actions are sufficient to excuse a delay in bringing a motion to intervene. *See* Mot. *passim;* Memo. *passim;* Reply *passim.*

Plaintiffs filed this action on September 30, 1992. *Chippewa*, 69 Fed.Cl. at 640. Proposed Intervenors filed their Motion on April 29, 2008. In the years between plaintiffs' filing of this case and Proposed Intervenors' application for intervention, Proposed Intervenors state that they "have tried exhaustively" to gain entitlement to the rights they believe they hold. Reply 19. Proposed Intervenors' efforts have included making inquiries of their elected representatives from which Proposed Intervenors gained information from the Secretary of the Interior. *See* Def.'s Resp. 15 (discussing Proposed Intervenors' actions between 1992–2008 and arguing that the Motion should be denied as untimely). Correspondence between the Secretary of the Interior and Proposed Intervenors' elected representatives, of which Proposed Intervenors were apprised, communicates the reasons for which Proposed Intervenors were not granted status as beneficiaries of the PJF. Def.'s Resp. Exhibit (Ex.) C at 4 (Oct. 26, 1989 Letter from Department of the Interior to Congressman Ron Marlenee), 10 (Nov. 5, 1990 Letter from Department of the Interior to Senator Max Baucus). Proposed Intervenors also filed an action in the United States District Court for the District of Montana containing allegations similar to those contained in their Complaint. *See* Pls.' Resp. 7–12; Pls.' Resp. Appendix (App.) A–115 to A–138 (Amended Complaint) at A–129, A–133, A–136; Pls.' Resp.App. A–165 to A–185 (Brief in Support of Amended Complaint) at

A–180. Proposed Intervenors' action in federal district court was dismissed on December 28, 2001. Pls.' Resp. 11; Pls.' Resp.App. A–247 to A–250 (*Estate of Gopher v. Sec'y of the Interior*, No. 00–100–GF–SEH, slip. op. at 3 (D.Mont. Dec. 28, 2001)) at A–249.

The court agrees with defendant that, based on the results of Proposed Intervenors' own efforts, "[b]y February, 1990, . . . [Proposed Intervenors] knew that they were not eligible to share in the PJF awards, had missed the application deadlines and did not qualify under the criteria specified by Congress, [the Department of the] Interior and the Tribes themselves." Def.'s Resp. 15. Prejudice to the parties should therefore be examined in light of the sixteen-year delay between the time plaintiffs originally brought this suit in 1992 and the time when Proposed Intervenors applied for intervention in 2008. A sixteen-year delay weighs against Proposed Intervenors. *See e.g., Cheyenne–Arapaho,* 1 Cl.Ct. at 296 (finding six and one-half year delay in applying for intervention a significant factor in denying intervention as untimely). In *Utah Association,* the court found that the parties were not prejudiced because the case was "far from ready for final disposition; no scheduling order ha[d] been issued, no trial date set, and no cut-off date for motions set." *Utah Association,* 255 F.3d at 1250–51. In this case, in contrast, there have already been findings of fact and conclusions of law made concerning a variety of issues including jurisdiction, *see Chippewa,* 69 Fed.Cl. at 641–56, 670–71, statute of limitations, *see id.* at 662–65, and class certification, *see id.* at 665–74. Per capita distribution of PJF funds has already been carried out. *See Chippewa,* 69 Fed.Cl. at 645–46. Many scheduling orders have been entered in this case since its inception, and the parties have been in alternative dispute resolution since August 2007, *see* dkt. nos. 298, 313 (referring portions of the parties' claims to alternative dispute resolution), during which progress has been made towards resolving plaintiffs' outstanding claims. The court therefore finds that "th[is] case ha[s] proceeded well beyond a preliminary stage, [such] that the request for intervention [i]s untimely." *J.R. Sand II,* 143 Fed.Appx. at 319 (upholding the trial court's denial of intervention).

■ Proposed Intervenors argue that they will suffer prejudice if they are not allowed to intervene because their ability to protect their interest will be impeded by a judgment in this case. Reply 18. However, because Proposed Intervenors have not demonstrated the absence of alternative venues in which relief may be sought, the prejudice they may suffer is minimal at best and intervention is inappropriate. *See supra* Part III.A.2. For the foregoing reasons, Proposed Intervenors' Motion is untimely.

B. Permissive Intervention

■ The court has broad discretion in deciding whether to allow permissive intervention. 6 James Wm. Moore, *Moore's Federal Practice* § 24.10[1], at 24–57 (3d ed. 2004) ("The [trial] court possesses broad discretion in determining whether to grant permissive intervention and will rarely be reversed on appeal."). In assessing whether a potential intervenor should be granted permissive intervention, the court must decide that a would-be intervenor's application is timely and that there is a "common question of law or fact" between the applicant's claim or defense and the main action. RCFC 24(b). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.* Because the court has already decided that Proposed Intervenors' Motion does not meet the timeliness requirement, *see supra* Part III.A.4, permissive intervention is inappropriate. However, even if Proposed Intervenors' Motion were viewed as timely, Proposed Intervenors fall short of meeting the standard for permissive intervention.

Proposed Intervenors argue that they should be permitted to intervene pursuant to RCFC 24(b) because they claim a "breach of trust" which arises from "a common set of facts" which also give rise to the main action. Mot. 2. Throughout their briefings, Proposed Intervenors make reference to defendant's alleged breach of fiduciary duties owed to Proposed Intervenors. *See, e.g.,* Reply 13 (explaining that Proposed Intervenors seek "enforce[ment] [of] U.S. trust obligation[s] to the PJF Chippewa beneficiaries"); *see also* Memo. *passim.* Plaintiffs in this suit are

PJF beneficiaries, recognized as such under the 1971 Distribution Act and the 1982 Distribution Act, seeking damages for defendant's alleged mismanagement of PJF funds while the monies were held in trust by defendant pending distribution. *See Chippewa*, 69 Fed.Cl. at 640–46. Proposed Intervenors are not PJF beneficiaries. *See* Reply 1–2 (discussing Proposed Intervenors' ineligibility to receive PJF funds); Def.'s Resp. 10. They did not receive, nor were they entitled to receive, per capita distributions of PJF monies. Def.'s Resp. 10. Therefore, although Proposed Intervenors include allegations of breach of fiduciary duties in their proposed Complaint, they have not demonstrated that there is a "common question of law or fact" between their claim or defense and the main action. *See* RCFC 24(b).

▮▮▮ The court must also "consider whether an intervenor would burden or prolong the proceedings by filing a counterclaim or motions on extraneous issues." *Freeman*, 50 Fed.Cl. at 310; *see also* 6 James Wm. Moore, *Moore's Federal Practice* § 24.10[1], at 24–57 (3d ed. 2004) ("[C]onsiderations of trial convenience dominate the question of whether to allow permissive intervention."). The majority of claims contemplated by Proposed Intervenors are based on issues of tribal recognition. *See* Mot. *passim;* Compl. *passim;* Reply *passim.* Proposed Intervenors themselves state, "[Proposed Intervenors] ask this court to determine deeper questions ... [regarding] lineal descent in the Chippewa band." Reply 3. As stated above, the sole question before this court is whether plaintiffs are entitled to compensation from defendant for a breach of its fiduciary duties in its role as trustee. The court agrees with defendant that the majority of claims which Proposed Intervenors intend to pursue are "different in kind and character" from those brought by plaintiffs in this litigation. Def.'s Resp. 14. It would be unrealistic to conclude that granting intervention would not disrupt the present status of this case.

▮▮▮ Furthermore, in order to "prevail on [their] motion for permissive intervention,

[Proposed Intervenors] must first demonstrate that this court has independent subject matter jurisdiction over [their] claims or defenses." *United Keetowah Band of Cherokee Indians of Okla. v. United States (United Keetowah)*, 78 Fed.Cl. 303, 307 (2007). This case can be analogized to cases in which permissive intervention has been denied on the basis that the would-be intervenors do not have a claim against the United States. *See, e.g., Hage,* 35 Fed.Cl. at 742 (denying permissive intervention in part because the applicants "do not have a claim against the United States"); *Karuk Tribe,* 27 Fed.Cl. at 432 (denying permissive intervention because "the applicant-intervenors do not have a claim or defense against the United States" and the "court entertains suits against the government"); *United Keetowah,* 78 Fed.Cl. at 307 (denying permissive intervention because applicant did not demonstrate that the court "ha[d] independent subject matter jurisdiction over [applicant's] claims or defenses"). These rulings stem from the nature of this court's jurisdiction. Under the Tucker Act this court has

> jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2006).[5] Proposed Intervenors have not demonstrated that this court would have jurisdiction over claims they propose to bring in the event that intervention were granted in this case. *See* Mot. *passim;* Compl. *passim;* Memo. *passim;* Reply *passim.* In particular, Proposed Intervenors' claims contesting federal recognition of plaintiff, Chippewa Cree Tribe of the Rocky Boy's Reservation, are likely not justiciable. *Samish Indian Nation v. United States (Samish),* 419 F.3d 1355, 1370 (Fed. Cir.2005) ("As a political determination, tribal recognition is not justiciable."), 1369–70 ("There are generally three means by which the federal government can recognize an In-

---

5. While these cases discuss the lack of a claim against the United States as a basis for denying permissive intervention, given the contours of the jurisdiction of this court, their reasoning applies with equal force to intervention of right under RCFC 24(a).

dian tribe[:] The government can enter into a treaty with a tribe[;] Congress can recognize a tribe by enacting a specific statute [;] ... [o]r the executive can recognize a tribe pursuant to the authority delegated by Congress.") (footnotes and citations omitted); *Cohen's Handbook of Federal Indian Law,* § 3.02[4], at 140 (2005 ed.) ("When Congress or the executive branch has found that a tribe exists, courts normally will not disturb that determination."); *Cohen's Handbook of Federal Indian Law,* § 3.02[4], at 141 (2005 ed.) ("[J]udicial deference to findings of tribal existence is ... warranted by the extensive nature and exercise of congressional power in the field."). Similarly, Proposed Intervenors' claims against plaintiff, Chippewa Cree Tribe of the Rocky Boy's Reservation, are also precluded by the limited nature of this court's jurisdiction. *See, e.g., Orion Scientific Sys. v. United States,* 28 Fed.Cl. 669, 670 (1993) ("[T]his court possesses no jurisdiction to hear or decide claims between private parties."); *Karuk Tribe,* 27 Fed.Cl. at 432 ("This court entertains suits against the government, not suits by American Indians against American Indians."). Lastly, Proposed Intervenors claims for equitable relief and declaratory relief are also outside the realm of this court's jurisdiction. *See, e.g., S. Nuclear Operating Co. v. United States,* No. 98–614C, 2007 WL 5177406, at *1 (Fed.Cl. Aug.21, 2007) ("The court cannot grant equitable or injunctive relief, except in limited circumstances not applicable here.").[6] In these circumstances, the court finds permissive intervention inappropriate.

IV. Conclusion

For the foregoing reasons, Proposed Intervenors' Motion is DENIED.[7]

IT IS SO ORDERED.

---

**6.** For a discussion of this court's jurisdiction over equitable claims, see *Anderson v. United States,* 85 Fed.Cl. 532, 538 & nn. 4–5 (2009).

**7.** In Proposed Intervenors' Response to Defendant['s] Answer (Reply), Proposed Intervenors state that "[s]hould this [c]ourt deny this motion, this will rubberstamp ... [p]laintiff['s] and [d]e-

---

fendant's arbitrary and capricious enrollment methods that has had deleterious effects on the Chippewa." Reply 7. The court notes that its decisions regarding motions to intervene, including Proposed Intervenors' Motion, do not advocate for or against the determinations reserved to, and made by, the other branches of government.